IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 2009 Session

## LEONARD EDWARD SMITH v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Hamblen County**
**No. 99-CR-310    O. Duane Sloane, Judge**

_____

**No. E2007-00719-CCA-R3-PD - Filed September 21, 2010**

_____

The Petitioner, Leonard Edward Smith, appeals as of right from the May 21, 2004 and March 2, 2007 orders of the Hamblen County Circuit Court denying his initial and amended petitions for post-conviction relief challenging his 1985 conviction and life sentence for the first degree felony murder of John Pierce, his 1989 conviction for the first degree felony murder of Novella Webb, and his 1995 sentence of death for the murder of Novella Webb.[1] On appeal, the Petitioner claims that the post-conviction court erred in denying relief because defense counsel provided ineffective assistance in both the trial and appellate proceedings related to these convictions and sentences and because multiple other constitutional violations call into question the validity of these convictions and sentences. After a careful and laborious review of the record, we affirm the denial of post-conviction relief relative to the Petitioner's conviction and life sentence for the murder of John Pierce and the Petitioner's conviction for the murder of Novella Webb, but we reverse the denial of post-conviction relief relative to the Petitioner's death sentence for the Webb murder and remand for a new sentencing hearing in that case. We do so based upon the conclusion that the post-conviction court erred in denying the Petitioner's claim that his trial attorneys provided constitutionally ineffective assistance in their investigation and presentation of available evidence in support of their motion to recuse the 1995 resentencing judge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Reversed in Part, and the Case is Remanded**

_____

[1]Even though the petitioner indicates in his principal brief that he is challenging only the order entered on March 2, 2007 it is clear from the substance of the issues raised in the brief that he is challenging the findings made by the post-conviction court in both the May 21, 2004 and March 2, 2007 orders.

1

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. and JON KERRY BLACKWOOD, SENIOR JUDGE, joined.

Paul J. Morrow, Jr. and Kelly A. Gleason, Nashville, Tennessee, for the appellant, Leonard Edward Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

This appeal arises from the denial of the petition for post-conviction relief, filed by Leonard Edward Smith, challenging his convictions and resulting sentences for the 1984 murders of John "Shorty" Pierce and Novella Webb. We affirm the denial of relief as to the Petitioner's conviction and life sentence for the murder of John Pierce and the Petitioner's conviction for the murder of Novella Webb, but we reverse the denial of relief as to the Petitioner's death sentence for the Webb murder and remand for a new sentencing hearing for that offense.

## Procedural History

This case has a long and complex procedural history. The Petitioner was indicted by a Sullivan County Grand Jury, along with co-defendants David Wayne Hartsock and Angela O'Quinn, on one count of first degree felony murder for the killing of John Pierce during the perpetration of a robbery of John Pierce and on one count of first degree felony murder for the killing of Novella Webb during the perpetration of a robbery of Novella Webb and Worley H. Webb. These offenses were alleged to have occurred on May 21, 1984.

On January 7, 1985, the Petitioner's first trial began with jury selection in Sullivan County; however, on the third day of jury selection, the trial court changed venue to Hamblen County and severed the Petitioner's trial from those of his co-defendants. The trial court did not, however, sever the offenses for the trial of the Petitioner.

On March 18, 1985, the Petitioner's trial began anew in Hamblen County. The Hamblen County Jury selected to hear the Petitioner's case found the Petitioner guilty on both counts of first degree felony murder for the deaths of Pierce and Webb. At the conclusion of the guilt phase, the State withdrew its notice of intent to seek the death penalty with respect to the Pierce murder. As a result, the Petitioner received a sentence of life imprisonment for the Pierce murder. The jury imposed a death sentence for the Webb murder. On direct appeal, the Tennessee Supreme Court affirmed the Petitioner's conviction

2

and life sentence for the Pierce murder but reversed the Petitioner's conviction and death sentence for the Webb murder and remanded for a new trial on that offense alone. See State v. Smith, 755 S.W.2d 757 (Tenn. 1988).

The Petitioner's 1989 retrial began in Hamblen County on August 21, 1989. The Petitioner was again found guilty of the murder of Novella Webb and again was sentenced to death. On direct appeal from this conviction and sentence, the Tennessee Supreme Court affirmed the Petitioner's conviction but reversed the death sentence and remanded for a new sentencing proceeding. See State v. Smith, 857 S.W.2d 1 (Tenn.), cert. denied, 510 U.S. 996 (1993).

The Petitioner's third sentencing proceeding was conducted in Hamblen County in 1995. After the presentation of the State's case, and during the cross-examination of the first defense witness presented, the Petitioner directed his attorneys to present no further proof and waived final argument. The trial court determined that the Petitioner was competent to make the decision to waive additional proof and argument. Defense counsel honored the Petitioner's request and presented no mitigating evidence. Based upon a finding of one aggravating circumstance, namely, that the Petitioner had been previously convicted of one (1) or more felonies involving the use or threat of violence to the person, the resentencing jury determined that the Petitioner should receive a sentence of death for the Webb murder. This death sentence was affirmed on direct review. See State v. Smith, 993 S.W.2d 6 (Tenn.), cert. denied, 528 U.S.1023 (1999).

**Factual Background**

The Petitioner and his co-defendants were arrested at daybreak on May 23, 1984, at a secluded house in Johnson County. Following his arrest, the Petitioner gave the following statement to Keith Carr, who was then a detective employed by the Sullivan County Sheriff's Department:

> I, Leonard Edward Smith, am giving this statement of my own free will and without any threats or promises being made to me. On Monday, May 21, 1984, I was with my girlfriend Angie O'Quinn and David Hartsock and we went and got some liquor and went to a road near the Sullivan-Carter County line. We parked and were just drinking and talking and smoked some joints. While we were on that road in my black Ford Pinto which I had painted black because it used to be orange, David said "Get out, I want to talk to you." He and I got out and walked a ways from the car where Angie couldn't hear us talking and David said, "I can get us a little bit of money down here at this store." He said, "It is the store down at the county line," and I asked him if it

was Shorty Malone's and he said, "Yes." Angie and I drove David down there, and let him off a little ways from the store. I parked on the little paved road beside the store. David had a thirty-two caliber chrome plated pistol with him. The pistol was his pistol. I heard several shots fired and just a few seconds later David came running around the store. David jumped into the car and said, "Get the hell out of here, I had to shoot him." I figured it was Shorty because he ran the store. We drove out the road that goes behind the side of Malone's Grocery, and it dead ends, and you can turn left to the Wautauga area or right back to Sullivan County. We turned onto the Wautauga Highway and drove to what is known as Mountain Road. I asked David if he shot the man, and he said that he shot him one time and the man pulled a gun and started shooting at him. I don't remember if he said what money he got. I drunk some more liquor, and made Angie get out of the car. I started driving and was just going to drive us out of the mountain. We came out at some store, and I turned left, and drove until I realized I was going to [sic] wrong way, and I pulled in at Webb's Store to turn. I stopped the car at Webb's and David jumped out, and I ran in the store behind him. David ran and jumped on the counter, and knocked the old man over and yelled to me, "Get that bitch" referring to an old woman at the end of the counter. I started towards her, and she started throwing things at me and started spraying paint on me. I fired one shot just to scare people, but the old woman just kept spraying orange paint and came towards me. I couldn't see because of the paint and I held the gun up and apparently the old lady was trying to get the gun away from me and it went off. We ran from the store when I fired the second shot. I didn't really know that I had shot her until we heard it later on the news. When we were in Webb's Store the old man was hollering, "Help me, help me," and hollering for his wife. The old woman never did say anything that I remember. I know that before we left the store, some man came up to the door, and I told him to get out of there. I didn't get any money from either store, and David didn't say if he did or not. David and I left Webb's and went back up towards Mountain Road, and picked Angie up. I told her we had to get out of there, and we drove down towards Underwood Park, and set the car on fire. David cut a hose next to the carburetor and set the car on fire. David and Angie and me took off on the trails, and really didn't know which way to go. We came out at a house on Indiana Creek. It was the Johnson residence because my dad had sold them the house. We didn't go to the house until late last night, and Angie got Gladys Sheets to take us to the home where we were arrested this morning. I had never been to the house before but had been in the area. When Gladys drove up to Dennis Cove, she said she thought we did it. I had taken my shirt and wrapped my feet so I could walk and I think I left it in Gladys' car or at the

4

house. Gladys had told us that Mrs. Webb, and the man at Malone's were both dead. We told Gladys that we didn't do it and she said, "If you didn't, you better keep the gun because the news said it was a thirty-eight" and she knew we had a thirty-two caliber. I told David to throw the gun out anyway because I knew we had done it. He threw it out as we went over a bridge, and we drove on up to the house. We stopped at a grocery store, and Angie and Gladys went in and got some food for us to take to the house. We fixed something to eat, went to sleep, but I felt like they knew where we were at. I had cut mine and David's hair with a pair of scissors Angie had in her pocketbook because I knew they would be looking for somebody with longer hair. This morning I heard a loud noise, and I knew we were caught then. I told Angie I was going out, and you come out too, so we won't get hurt. Somebody had yelled for us to come out, and David went out first. All I know is that everything didn't turn out the way it was supposed to, and it shouldn't have happened. I am sorry for what happened, because I know I am a thief, but I don't think of myself as a murderer. This is all I know to tell you about what happened.

Smith, 755 S.W.2d at 760-61.

At the Petitioner's first trial, this written statement to Detective Carr was read to the jury. See id. at 760-61. The jury also heard extensive evidence from various eyewitnesses as well as experts establishing that, on May 21, 1984, the Petitioner and Hartsock robbed Malone's Grocery Store and Webb's Grocery Store in rural Sullivan County and that, during the course of these robberies, Hartsock shot and killed John Pierce and the Petitioner shot and killed Novella Webb. See id. at 759-62. No evidence was presented on the Petitioner's behalf at either the guilt or sentencing phases of his first trial. See id. at 762.

At the Petitioner's second trial, the Petitioner's written statement to Detective Carr was again read to the jury with all references to the Pierce murder redacted. See Smith, 857 S.W.2d at 8. The 1989 retrial jury also heard substantially the same evidence from the various eyewitnesses establishing the Petitioner's guilt for the murder of Novella Webb committed during the course of the robbery of Webb's Grocery Store. See id. at 4-6.

Criminal Court Judge Edgar P. Calhoun, Jr. presided over the Petitioner's first two trials. After the supreme court reversed the Petitioner's second death sentence for the Webb murder, Judge Calhoun retired and Judge Lynn W. Brown, Jr. became the trial judge assigned to the Petitioner's case. During pretrial proceedings on the second remand, Judge Brown denied a defense motion to recuse him. The recusal motion was based on the fact that Judge Brown, while still a prosecutor, had obtained a robbery conviction against the Petitioner

which the State intended to use as an aggravating factor in seeking the death penalty at the resentencing. This court granted the Petitioner an extraordinary appeal from the denial of the motion to recuse and affirmed Judge Brown's denial of the motion. See State v. Smith, 906 S.W.2d 6, 11-12 (Tenn. Crim. App. 1995).

At the Petitioner's 1995 resentencing, "[t]he State introduced very little proof regarding the circumstances of the offense." Smith, 993 S.W.2d at 9. After waiving opening statement, the State introduced the following evidence in support of the single aggravating circumstance pursued in this case:

> The State's proof consisted of copies of indictments and judgments reflecting that the defendant had been convicted of robbery in Carter County on October 13, 1980, and on February 21, 1985, and that the defendant had been convicted of first degree murder for the killing of John Pierce on March 20, 1985. The reference to the life sentence imposed for the Pierce murder conviction had been redacted from the copy of the judgment passed to the jury. The State also introduced the judgment which established that the defendant had been convicted of the first degree murder of the victim in this case on August 23, 1989. With respect to each of these convictions, the State offered identification testimony to establish that Leonard Edward Smith is the same person who was previously convicted of the robbery and murder offenses.

Id. at 10. The State also presented the following victim impact testimony:

> As its final witness, the State called Katy Mahoney, the daughter of the victim in this case. Mahoney testified that her father and mother had operated the country store Smith robbed for many years and that her mother had been fifty-nine-years-old when she was murdered. Mahoney testified that her father was seventy-eight-years-old at the time of the robbery and murder and that his ribs had been broken during the episode when he was pushed into a trash can. According to Mahoney, her father's health had declined "drastically" after the robbery and murder. He was never able to work again and eventually sold the store. He died the next year from a brain tumor. When asked how the family had been affected by her mother's murder, Mahoney testified that the murder "won't go away," that "we live with it all the time" and that "it's caused problems now for eleven years." The State rested its case-in-chief at the conclusion of Mahoney's testimony.

Id.

The first witness to testify on behalf of the defense at the resentencing was Keith Carr, who by then was the Sheriff of Sullivan County. He read the jury the written statement given by the Petitioner immediately following his arrest in 1984. See id. at 10-12. On cross examination,

> Sheriff Carr said that Webb ha[d] been killed approximately forty-five minutes after John Pierce, and he estimated that the driving time from Malone's Store to Webb's Store is about thirty minutes. Sheriff Carr had examined the murder scene at Webb's store and had searched for a bullet in a pool of blood about an inch deep by using a vegetable strainer. In his search, Sheriff Carr discovered a mark on the wall behind the counter at Webb's store which had been caused by a bullet striking the wall. He also had observed the victim's body and said that the bullet which caused death entered at the victim's right nasal passage. The .32 caliber gun used in the Webb murder was found underneath a railroad bridge. Orange paint spots were visible on the gun when it was recovered, and it had six live rounds in the chamber. According to Sheriff Carr, the route Smith claimed to have driven after leaving Webb's store was along a curvy, mountainous, dirt road which was very treacherous. A day or so after the murder, Sheriff Carr found the defendant's badly burned car near an area where Smith had been camping with Hartsock and O'Guinn [sic] prior to the murder. Also found at that site were partially burned articles of Smith's clothing and strands of Smith's and Hartsock's hair which had been cut to disguise their appearance. Sheriff Carr testified that Smith, Hartsock, and O'Guinn [sic] were arrested on May 23, 1984, while hiding in a home in an isolated area of Dennis Cove. Gladys Sheets, one of Hartsock's relatives, had driven the trio to this location and had stopped along the way to allow O'Quinn to purchase food and camping supplies. A live .32 caliber round was found in Smith's pocket when he was arrested. Smith's and Hartsock's hair had been cut very short. At the time of the Webb murder, Smith was twenty-three-years old. Hartsock and O'Quinn were eighteen or nineteen years of age. Though Smith said he felt remorse, Sheriff Carr testified there was nothing indicative of remorse in Smith's demeanor when he gave the statement.

Id. at 12.

The circumstances surrounding the Petitioner's waiver of mitigation were as follows:

> After Smith stated, "I'm ready to rest," during a jury-out hearing, one of Smith's attorneys advised the trial court that Smith had instructed him earlier that morning to waive mitigation. Defense counsel advised Smith against

7

waiving mitigation, but Smith continued to insist upon that course of action. When the trial court asked if any expert psychological proof raised [any] question about Smith's competency, defense counsel responded, "not anything that would justify any claim that he was incompetent I don't feel like. If I'd felt like that before today obviously I would have made it known to the court." At that point the trial court accurately stated the law as follows:

> Well, this is a bit of a difficult situation. In general, an attorney must represent a client, and the rule is that the client determines what is in his interest and what he wants done, and then the lawyer has an obligation to, first of all, advise the client regarding alternatives; but, after giving proper and thorough advice, to follow the wishes of the client. Is that not correct, Gentlemen?

To the trial court's inquiry, Smith's attorneys responded, "Yes, sir" and "Yes, Your Honor." Before making a final decision on this issue, the trial court allowed defense counsel a twenty minute recess to confer privately with Smith regarding his desire to waive mitigation. When the hearing reconvened, defense counsel reported that they had informed Smith that they were prepared to present mitigation proof, had advised him of the benefits of presenting the proof, and had warned him of the harm which could result if the proof was not presented. Despite this advice, Smith had remained insistent that they "rest the case and waive argument."

At this point, the trial court attempted to question Smith to ensure that he understood his rights and the potential consequences of his decision. Because the trial court had admonished Smith earlier in the trial to speak only through his attorneys and to refrain from speaking aloud during the testimony of other witnesses, Smith refused to be sworn and would not respond to the trial court's inquiries except through his attorneys. Smith advised his attorney to inform the trial court that he wanted to rest his case and waive argument.

At that point, the trial court advised Smith as follows:

> if you cease putting on mitigating evidence and you instruct your counsel to not argue and they do both, they don't put on any other proof, and they do not argue in your benefit, in the court's opinion this jury will almost certainly return with a verdict of death by electrocution. And, I guess I've only seen perhaps

8

twelve or thirteen death penalty cases tried and most of them did not result in a death penalty verdict. But, from those that I have seen in five or six death penalty verdicts, actually about half; but if your attorneys follow your instructions that will be the very likely result. Do you understand that, sir?

Smith, through his attorney, answered "Yes" to the trial court's question.

The trial court further questioned defense counsel about the defendant's competence. On the first occasion, counsel stated, "Of course, I've known Leonard now for ten or eleven years. He's always been competent, at least, in my opinion." After commenting that the defendant's attorneys had each practiced law for twenty years, the trial court inquired once again, "And, you have no personal doubts as to his competency and legal ability to make such a decision I take it?" Neither attorney expressed any doubt about Smith's competence to waive mitigation. Before recalling the jury, the trial court commented that he had observed Smith confer with counsel and actively participate in the case and once again advised Smith of his right to present mitigation and of the likely consequences of the waiver. Smith adhered to his decision to waive mitigation and argument. When the jury was recalled, the defense rested.

Id. at 14-15.

The State then recalled Katy Mahoney as a rebuttal witness "who testified that during the eleven years since the murder, she had never seen evidence to indicate the defendant felt remorse." Id. at 12.

**Post-Conviction Proceedings**

On December 17, 1999, the Petitioner filed a *pro se* petition for post-conviction relief challenging only his conviction and death sentence for the murder of Novella Webb. Upon consideration of the *pro se* petition, the post-conviction court appointed the Office of the Post-Conviction Defender as lead counsel of record for the Petitioner and a private attorney as local counsel for the Petitioner. The court also entered a preliminary order concluding that the petition stated a colorable claim and directed appointed post-conviction counsel to file an amended petition. An amended petition was filed on May 10, 2001. This amended petition challenged not only the Petitioner's conviction and sentence for the Webb murder but also for the first time challenged the Petitioner's conviction and sentence for the Pierce murder. The amended petition candidly conceded that the Petitioner's conviction and

sentence for the Pierce murder had become final in 1988, but it included the following allegation in support of why the statute of limitations applicable to petitions for post-conviction relief should be equitably tolled relative to the claims challenging the Pierce murder conviction and life sentence:

> Petitioner was represented by counsel, [Larry S.] Weddington and [J. Robert] Boatright, from the time of his original trial in 1985 through the direct appeal of his sentencing which became final in 1999. At no time in that period was counsel's performance reviewed for ineffectiveness. Following the appeal of Petitioner's re-sentencing[,] the subsequent filing of Petitioner's pro se [p]etition for post-conviction relief was the first opportunity for Petitioner to attack the judgment of the Pierce conviction. Petitioner should therefore be permitted to attack the judgment of the Pierce conviction despite the fact that the statute of limitations has run. See Burford v. State, 845 S.W.2d 204 (Tenn. 1992); see also Workman v. State, ___ S.W.3d ___, 2001 WL 303661 (Tenn. 2001).

Post-conviction counsel filed additional amendments to the petition on January 10, 2002 and November 20, 2002. In the last amendment to the petition, post-conviction counsel raised for the first time the claim that the Petitioner is mentally retarded and therefore constitutionally ineligible for the death penalty. At no point in either the initial *pro se* petition or in any of the amendments thereto did the Petitioner raise any claim related to Judge Brown's failure to recuse himself.

The post-conviction court elected to bifurcate the mental retardation claim from all remaining claims and conducted a hearing on that claim only on April 1-2, 2004.[2] By order entered May 21, 2004, the post-conviction court denied the Petitioner's mental retardation claim and reserved ruling on all remaining claims. Post-conviction counsel filed a motion questioning the court's factual findings relative to the denial of the mental retardation claim. In response to this motion, the court entered a second order, on April 21, 2005, clarifying its findings and adhering to its prior ruling that the Petitioner had failed to present sufficient proof in support of the mental retardation claim.

A hearing on all remaining claims took place on March 28-29, 2006, and December

---

[2]We note that, both prior to and at the outset of the hearing on the mental retardation claim, the Petitioner unsuccessfully attempted to withdraw the claim from the post-conviction court's consideration. Upon being questioned by the judge again at the conclusion of the mental retardation hearing, the Petitioner indicated that there was then no point to withdrawing the claim and that he did not care whether the judge chose to rule on it or not.

4, 2006. At the last hearing, the post-conviction court allowed counsel, over the State's objection, to orally amend the claims raised in the petition and amendments thereto to include an ineffective assistance of counsel claim related to counsel's failure to adequately investigate the facts supportive of the motion to recuse Judge Brown and a due process claim based on Judge Brown's failure to recuse himself.

Larry S. Weddington and J. Robert Boatright testified at the post-conviction hearing that they had been the Petitioner's court-appointed attorneys for all of his trial and direct appellate proceedings. Weddington graduated from law school in 1973 and passed the bar in 1974. From 1974 until 1985, he was a solo practitioner who made himself available for appointments in criminal cases. Boatright graduated from law school in 1974, after which he worked for an insurance defense firm as an associate from 1975 until 1982 when he went into practice with another attorney and made himself available for appointments in criminal cases.

When the Petitioner was indicted for the Pierce and Webb murders, there was no public defender system in place in Sullivan County. On the day the Petitioner appeared in the General Sessions Court for Sullivan County following his arrest on the murder charges, Weddington just happened to be in the courtroom and was appointed to represent the Petitioner. At the time, Weddington's practice consisted primarily of criminal cases involving serious offenses. He had tried one death penalty case prior to his appointment as the Petitioner's counsel, which had resulted in the defendant receiving the death penalty. He had also previously represented other defendants charged with first degree murder that did not involve the death penalty. Weddington testified at the post-conviction hearing that he felt he had provided the Petitioner with effective and competent representation and that he had maintained a good rapport with the Petitioner during the representation.

Boatright was not appointed as co-counsel for the Petitioner until the Petitioner was bound over for indictment in criminal court. Even though not required by law at the time, Judge Calhoun generally appointed two attorneys on all capital cases in his court. Boatright had only had an occasional criminal case during his time with an insurance defense firm. He had never handled a capital case and had only handled one first degree murder case in 1983 before being appointed as second chair counsel in the Petitioner's case. Boatright had never attended any capital case seminars before being appointed as counsel for the Petitioner. However, he testified at the post-conviction hearing that he and Weddington had availed themselves of all the assistance they could get from the Capital Case Resource Center (CCRC), which was in existence during most of the time they represented the Petitioner.[3]

---

[3]As stated by post-conviction counsel at the hearing below, CCRC ceased to exist in October of 1995 when federal funding for the organization ceased. By that time, state funding for the organization had

In the late 1980's or early 1990's, Boatright stopped practicing criminal law but remained court-appointed counsel for the Petitioner until the conclusion of his direct appellate proceedings. Boatright testified that the Petitioner had never tried to remove either him or Weddington as court-appointed counsel at any point during the representation.

Weddington testified that he and Boatright equally divided up the "legwork" on the Petitioner's case, never considered one or the other as lead counsel, and did most of the legal work together. Boatright testified that each attorney kept separate files throughout the representation but maintained copies of all of the same important documents and pleadings in their separate files. Boatright also testified that he and Weddington kept their own notes on the case but were aware of the contents of one another's files.

Both attorneys testified that they had cited economic hardship as grounds for a motion to withdraw as counsel filed prior to the 1995 resentencing. Boatright testified that they had made an effort to find substitute counsel for the Petitioner, but to no avail. He conceded that it would have been very difficult for a new attorney to come into the case in 1995 and be as familiar with it and the Petitioner as were he and Weddington. Boatright testified that the economic hardship cited in the motion to withdraw had no bearing on his diligence in representing the Petitioner after the motion was denied. He testified that he spent many hours preparing for each of the trials in this case. Weddington testified that he thought a public defender should be appointed to represent the Petitioner since, by the 1995 resentencing, a public defender system was in place in the jurisdiction. Weddington also testified that he felt some fresh thoughts on the case might be better for the Petitioner. Weddington denied that the financial burden on his practice of continuing with the representation of the Petitioner was the primary motivation behind the motion to withdraw.

Both attorneys testified that, after the trial and during the pendency of the Petitioner's direct appeal from the 1995 resentencing, they filed a motion to remand the case to the trial court for a determination of the Petitioner's competence to waive mitigation and possible mental retardation. Weddington testified that the motion had been filed because the preparation of the appellate brief made him and Boatright second-guess whether they should have been more aggressive in trying to get Judge Brown to reject the Petitioner's waiver.

Attached to the motion was an affidavit from Boatright that he testified reflected what he had perceived as a change in the Petitioner's behavior immediately prior to the 1995 resentencing. In that affidavit, Boatright stated:

In the representation of Leonard Edward Smith, I have participated in

---

already ceased in July of 1995.

12

two (2) bifurcated trials, two (2) subsequent appeals to the Supreme Court of Tennessee, and numerous motion hearings. For the most part, Mr. Smith cooperated with counsel regarding trial preparations including discussions and decisions regarding trial strategy and tactics, the evidence to be introduced and the witnesses to be called on behalf of the defense. However, during preparations for the third sentencing hearing there were some changes in Mr. Smith's behavior. At a pre-trial motion hearing in early 1995 in Mountain City, Tennessee, Mr. Smith expressed concern about the presence of the murder victim's daughter at the hearing. He stated that he was fearful that she might be concealing a weapon under the overcoat that she was wearing inside the courtroom and that she might shoot him. He also expressed his belief in an affidavit he filed with the trial court that there was a conspiracy between an investigator in the public defender's office and the murder victim's daughter to have Mr. Smith killed. In the approximately twelve (12) years that I had represented Mr. Smith, he had never before expressed these type fears or concerns to me.

A couple of months thereafter, the trial court arranged for Mr. Smith to be transported to the Washington County Jail in Jonesborough, Tennessee for interviews and examinations by one or more possible expert witnesses for the defense. I received a telephone message from one of the defense experts advising that he had gone to the Jail for the purpose of interviewing Mr. Smith, but that Mr. Smith had refused to see or talk to him. I subsequently received a telephone message from one of the jail administrators indicating that Mr. Smith was being uncooperative, refusing to eat, and demanding that he be returned to River Bend in Nashville. I traveled to the Washington County Jail and attempted to convince Mr. Smith that it was in his best interest that he meet with the defense experts, but he again refused to meet with the defense experts in that facility, and stated that he wanted to be removed from the Washington County Jail as soon as possible. The following day, co-counsel and I conferred together with Mr. Smith at the Washington County Jail. He expressed the fear that the murder victim's son-in-law [Dan Mahoney], who was the mayor of Johnson City in Washington County, had political control of the jail facility, and that Mr. Smith would be poisoned if he ate the food at the facility, or that he would be killed in some manner if he remained there. He advised that he would meet with the defense experts, but not while he was in the Washington County Jail.

In a few days he was returned to River Bend in Nashville without having met with the defense experts. When he was transported several weeks

13

later to the Hamblen County Jail in Morristown, Tennessee for a motion hearing, he met with the defense experts at that facility.

Thereafter, co-counsel and I visited Mr. Smith at the River Bend facility in Nashville, Tennessee several weeks prior to commencement of the third sentencing hearing. He was more cooperative and in control of his emotions then [sic] when he was in Mountain City, Jonesborough or Morristown.

The next time I saw Mr. Smith was at his third sentencing hearing in the Criminal Court of Hamblen County at Morristown, Tennessee in September of 1995. Mr. Smith again began displaying the behavior that he had exhibited earlier in the year at Mountain City and in the Washington County Jail. He appeared distraught and on edge, and became argumentative with the jail personnel and with the trial court. He complained about his treatment in the jail, and in protest, insisted that he wear his prison uniform into the courtroom. He spoke out in open court, argued with the trial judge, and subsequently refused to communicate directly with the trial judge.

Nonetheless, his decision to waive presenting further mitigation evidence after calling only one witness, and to rest his case and offer no final argument, came as a complete surprise to me. In some ways, he talked and acted like the same person that I had been representing for approximately twelve (12) years, but, in hindsight, he was reacting quite differently to the pressures of trial and the courtroom setting than he had in his two (2) previous trials. Upon reflection and a review of Mr. Smith's behavior over the entire period of time that I have represented him, I now have a real question about his mental ability to have competently made the decision that might very well cost him his life.

Boatright clarified in his testimony that he never opined in the affidavit that the Petitioner was, in his opinion, incompetent to waive mitigation. Boatright testified that the statements he made in the affidavit were nothing more than second-guessing or "Monday morning quarterbacking." He explained:

Starting with back in 1985 and leading up to this point, the question for me had been was Mr. Smith competent to stand trial. And to my knowledge, all the way through, that had been resolved not only in my mind but by whatever examinations he had that he was competent to do that. And on this day that we've been referring to in 1995 at the hearing when he chose to waive his mitigation, that was my mindset, that he was — at that time he was competent

14

to stand trial and, therefore, competent to choose not to stand trial.

After that hearing and getting in toward just, you know, several weeks thereafter, getting in toward looking at the appeal and the issues and what have you, my thought was, you know, is that the type of competence, is that the same standard for someone that's waiving mitigation in a death penalty case. I don't know the answer to that question. But while I then and still felt like he was competent as far as standing trial, conversing with his lawyers and that sort of thing, did he have such mental and emotional problems at the time that he somehow — is there a legal standard where he was not able to make the decision regarding waiving mitigation. That's what prompted the affidavit that we've been going over.

Also attached to the remand motion was an affidavit from Weddington describing the circumstances surrounding the Petitioner's waiver of mitigation, stating that the record was not complete due to the conduct of the Petitioner in waiving mitigation, and concluding that further inquiry should have been made into the Petitioner's "mental state" at the time of the waiver. However, Weddington admitted in his testimony that, at the time the remand motion was filed, neither he nor Boatright had any evidence indicating that the Petitioner might not have been competent to waive mitigation. Weddington acknowledged in his testimony that the appellate record for the 1995 direct appeal did not contain any of the reports from the defense experts documenting any problems the Petitioner had with brain functioning or the processing of information.

In further support of the motion, the attorneys attached affidavits from Dr. Thomas Schacht, a board certified clinical and forensic psychologist, and Dr. Murray Smith, M.D., who was certified as a specialist in treating alcohol and drug addiction. These experts had been retained by defense counsel in preparation for the 1995 resentencing.

Dr. Schacht's affidavit stated in pertinent part as follows:

The record and my own evaluation confirm that Mr. Smith suffers neurological deficits consistent with brain damage. Of particular relevance for the court is that, on tests which measure ability to attend and concentrate, his scores are comparable to those produced by individuals who are in the lower ranges of the mentally retarded. This impairment is especially relevant to the question of whether he possesses adequate capacity to appreciate the ongoing events of a court proceeding and assist his attorneys in that regard. . . .

In view of the foregoing, I believe that there was a serious question

15

regarding whether Mr. Smith was competent to make the decision to waive presentation of mitigating evidence at his sentencing hearing. In my opinion, his mental impairments were such that further inquiry regarding his competency should have been made at the time of trial. I base this opinion on the results obtained from my pretrial evaluation of Mr. Smith, the symptoms of paranoia and depression manifested by Mr. Smith prior to trial, and the fact that the practical demands as well as the psychological stress of a trial situation would be expected to exacerbate such symptoms. . . . Had I been asked by the Court or the attorneys, I would have been willing to immediately and contemporaneously evaluate Mr. Smith for the purpose of providing evidence related to mental capacities underlying competency to make the decision to forego proof at his sentencing hearing. . . .

I am willing now to conduct an evaluation of Mr. Smith's competency-related capacities at the time of trial. Although a retrospective determination of competency is more difficult to make than a contemporaneous determination, I am not aware of any conditions which would make it impossible to undertake such an evaluation at this point in time. It should be noted, however, that it will become increasingly more difficult to make an accurate determination of competency the further removed in time the evaluation is from the trial. Therefore, I recommend that any evaluation be conducted as soon as possible.

The affidavit from Dr. Smith stated in pertinent part:

At the request of his attorneys, I interviewed Leonard Edward Smith and reviewed numerous documents pertaining to his background and history. My evaluation revealed Mr. Smith to be mentally retarded as a result of brain damage resulting from childhood medical trauma and chronic abuse of alcohol and inhalants.

During my interview with him, Mr. Smith exhibited extremely paranoid beliefs, based in part on his limited cognitive abilities and in part on emotional disturbance resulting from continuing episodes of violence throughout his childhood. Mr. Smith is also very impulsive, and when frightened or angry, he reacts in an irrational manner. His perception that the victim's family was conspiring with the prosecution and local law enforcement to deny him a fair trial could easily have produced such a reaction during the proceedings.

Although I was present in court that day, I was not consulted by Mr.

16

Smith's attorneys prior to their allowing him to make the decision to rest his case and waive argument. I have since been contacted by them, and expressed the opinion that Mr. Smith's competency to make such a decision was questionable. Given his paranoia, impulsivity, and limited mental abilities, I have serious doubts that Mr. Smith was in fact competent to rationally assist in his own defense at that point in time.

On March 2, 2007, the post-conviction court entered findings of fact and conclusions of law in support of the denial of all remaining claims for relief. The court's findings were as follows:

Initially, the court finds as a matter of law that any allegations relating to the original 1985 proceedings (Pierce conviction) and the 1989 proceedings (Webb guilt phase) have been waived for failure to allege them in any prior proceedings within the one year statute of limitations provided under the Act. Furthermore, having reviewed each allegation, the court finds none of them merit relief because the petitioner has failed to prove the allegations by clear and convincing evidence. The remaining allegations related to the 1995 resentencing trial are considered below. . . .

The petitioner alleges that he was denied the effective assistance of counsel at his 1995 resentencing trial. The petitioner presents an exhaustive list of instances where trial counsel failed to adequately prepare for trial relative to their investigation of the case, knowledge of relevant case law, motions practice, contact with the petitioner, presentation of witnesses and interposing of objections during the trial. . . .

The record shows that counsel began their representation of the petitioner in preparation for his initial trial in 1985 and continued in their representation throughout the direct appeal of the 1995 resentencing trial. Attorney Larry Weddington testified at the evidentiary hearing that the petitioner was the second defendant he had represented who was charged with a capital offense. He stated that he and Attorney Robert Boatright shared the workload of petitioner's case equally. He testified that the petitioner's decision to waive mitigation at resentencing surprised him and that is what motivated counsel to file a motion for remand in order to address the waiver issue more fully. He recalled that he did not present evidence of the petitioner's alleged mental retardation because he never had any reason to believe that the petitioner was suffering from mental retardation.

17

Attorney Robert Boatright testified that he had practiced ten years before taking the petitioner's case in 1985. He stated that he worked as "second chair" to Attorney Larry Weddington but that they had equally divided the work on petitioner's case. He recalled that he was unaware of any drug use by the petitioner during his incarceration but that the petitioner was often upset regarding the conditions of his incarceration. Boatright recalled the petitioner's decision to waive mitigation at the resentencing trial in 1995 and affirmed that throughout his representation of the petitioner he never questioned the petitioner's competency. Furthermore, he recalled that no expert witnesses ever voiced concerns regarding the petitioner's competency.

By the time of the 1995 resentencing trial, counsel had represented the petitioner for over ten years and throughout two successful appeals. The main crux of petitioner's allegations of error on post-conviction relate to the petitioner's competency to waive mitigation. This court notes that the appellate courts reviewed several issues relating [to] the petitioner's waiver of mitigation and found no error. A competent defendant may waive the presentation of mitigating evidence. . . . The resentencing court made an adequate inquiry into the petitioner's competency before allowing him to waive mitigation. In hindsight, this court finds that a better practice in the future should a defendant elect to waive mitigation would be to hold a jury out hearing for the purpose of inquiring of the defendant, counsel and relevant experts regarding the defendant's competency at the time the decision to waive is being asserted. However, in light of the long history of representation, multiple psychological evaluations and the petitioner's overall demeanor as reported by trial counsel, this court can find no merit to the petitioner's allegations regarding competency to waive mitigation.

Relative to the remaining allegations of ineffective assistance of counsel at resentencing, after full consideration of trial counsel's background and experience, the very length of their representation, their preparation for the two previous trials, subsequent appeals and resentencing trial, and the evidence presented at the evidentiary hearing, this court cannot find that counsel's performance fell below an objective standard of reasonableness. Furthermore, when evaluated from counsel's perspective at the time of the trial, this court cannot find that counsel rendered ineffective assistance to the petitioner. Therefore, the petitioner is not entitled to relief relative to the allegation of ineffective assistance at the resentencing trial. . . .

The petitioner alleges that he was denied his right to the effective

18

assistance of counsel at the appellate level of his prior proceedings. . . . The petitioner alleges deficient representation on appeal relative to three basic areas. First, he claims that counsel failed to make adequate challenges to the constitutionality of the death penalty. The numerous constitutional issues that the petitioner claims were erroneously omitted have been routinely rejected by our appellate courts. In order to receive post-conviction relief, an omitted issue must be one in which counsel would have prevailed had it been properly raised. Therefore, the petitioner is not entitled to relief relative to the alleged failure to raise constitutional errors.

Next, the petitioner alleges that counsel failed to raise appropriate challenges to jury instructions on appeal. A review of the record shows that counsel raised numerous challenges to the jury instructions throughout the litigation of this case. Any additional errors that are alleged as issues in the post-conviction litigation have been decided contrary to defendants and petitioners by our courts. In order to prevail on his claim of ineffective assistance of counsel on appeal, any omitted issue must be one in which counsel would have prevailed had it been properly raised. Therefore, the petitioner is not entitled to relief relative to [the] alleged failure to challenge the jury instructions on appeal.

Finally, the petitioner alleges that counsel failed to challenge on appeal that the death penalty violates international law. In order to prevail on his claim of ineffective assistance of counsel on appeal, an omitted issue must be one in which counsel would have prevailed had it been properly raised. This issue is without merit. Therefore, the petitioner is not entitled to relief relative to the alleged failure to challenge the death penalty as violative of international law. . . .

The petitioner makes multiple allegations regarding the constitutionality of the death penalty. Initially, the court notes that these allegations are waived for failure to assert them on direct appeal. Furthermore, these challenges have been decided contrary to the petitioner's position by our appellate courts in countless cases. . . .

### Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann.

19

§ 40-30-103; see also Tenn. Code Ann. § 40-30-105 (1986). Because the petition was filed after the enactment of the Post-Conviction Procedure Act of 1995, the Petitioner had the burden of proving by clear and convincing evidence the allegations of fact contained within his petition and the amendments thereto. Tenn. Code Ann. § 40-30-110(f). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony were for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, claims that trial or appellate counsel provided the Petitioner with constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, our review of the denial of such claims is de novo, accompanied with the presumption that the findings of fact made by the post-conviction court in support of the denial of such claims are correct unless the record preponderates against such findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). We accord no presumption of correctness to the conclusions reached by the post-conviction regarding whether trial or appellate counsel provided constitutionally deficient assistance. See Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586.

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 350 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). The Petitioner's claims that his trial attorneys provided constitutionally deficient assistance are governed by the following two-prong test:

20

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Combs, 205 F.3d at 277. Stated simply, the Petitioner must have proven both that counsel's performance was constitutionally deficient, and that the deficiency prejudiced the defense. See Goad v. State, 938 S.W.3d 363, 369 (Tenn. 1996). "Failure to prove either deficiency or prejudice provides a sufficient basis to deny relief." Id. at 370.

The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, was "outside the range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); King v. State, 989 S.W.2d 319, 330 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to satisfy this prong of the test, the Petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278; see also Goad, 938 S.W.2d at 369. As a result, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Additionally, the court should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Goad, 938 S.W.2d at 369; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." Goad, 938 S.W.2d at 369. Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987). Notwithstanding, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785.

21

The prejudice prong of the Strickland test requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also King, 989 S.W.2d at 330. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In evaluating whether a petitioner has satisfied this prong of the test, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, the Petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587.

### *Challenge to Pierce Murder Conviction and Life Sentence*

The Petitioner argues that the post-conviction court erred in denying his claims related to his conviction and sentence for the murder of John Pierce. He claims that his defense attorneys provided ineffective assistance by: (1) failing to present any theory of defense at the 1985 trial relative to the Pierce homicide; (2) failing to meaningfully cross-examine Keith Carr at the 1985 trial; (3) failing to properly investigate and retain expert witnesses to the Petitioner's diminished capacity and intoxication at the time of the Pierce homicide; (4) failing to adequately prepare and argue a motion to suppress challenging the Petitioner's arrest, detention and post-arrest interrogation; (5) failing to adequately develop as an issue on appeal the denial of the suppression motion; and (6) failing to adequately raise and argue on appeal the insufficiency of the evidence to convict relative to the Pierce murder.

The Petitioner acknowledges in his brief that the limitations period for filing these claims had long since run prior to the initiation of the post-conviction proceedings below, but he asks this court to carve out an exception to the limitations period in these circumstances because Weddington and Boatright did not cease representing the Petitioner until 1999. The Petitioner argues that the proceedings below were the first meaningful opportunity he had to raise any post-conviction claims relative to his conviction and sentence for the murder of John Pierce. He asserts that a successful challenge to his conviction for the Pierce murder would have eliminated the most serious prior offense supporting the single aggravating factor found by the 1995 jury in support of his death sentence for the murder of Novella Webb.

The State argues that Weddington and Boatright testified at the hearing below that they were in no position to file a petition for post-conviction relief challenging their own performance in the trial and appellate proceedings related to the Petitioner's conviction for the murder of John Pierce. However, Boatright actually testified that he and Weddington had never discussed either filing a petition for post-conviction relief challenging the Pierce

murder conviction or making an effort to obtain counsel for the Petitioner to do so. On cross-examination, Boatright testified that he had been "asked" about filing a post-conviction petition relative to the Pierce murder conviction and had concluded that, given the Petitioner's statement relative to his involvement in the Pierce murder, there would have been no chance of getting that conviction and sentence set aside. It is unclear from Boatright's testimony whether it was the Petitioner who "asked" about the filing of a post-conviction petition relative to the Pierce murder conviction. Boatright conceded that he and Weddington, as the Petitioner's trial and appellate counsel on the Pierce case, were not in the best position to evaluate the Petitioner's potential success in any bid for post-conviction relief from that conviction.

Under the Post-Conviction Procedure Act as it existed prior to the 1995 revisions, "[a] prisoner in custody under sentence of a court of this state must petition for post-conviction relief . . . within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred." Tenn. Code Ann. § 40-30-102 (1986). The 1995 revisions not only shortened the limitations period for filing a petition to one (1) year, see Tenn. Code Ann. § 40-30-102(a) (1996), but also limited the number of petitions that could be filed in any given case. See Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997). Specifically, the 1995 Act "contemplates the filing of only one (1) petition for post-conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment." Tenn. Code Ann. § 40-30-102(c) (1996). However, the 1995 Act also states that a "petition for post-conviction relief shall be limited to the assertion of claims for relief from the judgment or judgments entered in a single trial or proceeding. If the petitioner desires to obtain relief from judgments entered in separate trials or proceedings, the petitioner must file separate petitions." Tenn. Code Ann. § 40-30-104(c) (1996). This court has interpreted this last provision to mean that a judgment of conviction and sentence affirmed on direct appeal is final for purposes of seeking post-conviction relief, even though there may be unresolved remanded charges arising from the same charging instrument. See Roland R. Smith v. State, No. M2007-01420-CCA-R3-PC, slip op. at 2-3 (Tenn. Crim. App., Nashville, Oct. 27, 2008); Stephen Willard Greene v. State, No. E2005-02769-CCA-R3-PC, slip op. at 4-6 (Tenn. Crim. App., Knoxville, Apr. 25, 2007).

In the Petitioner's case, the date of final action of the highest state appellate court to which an appeal was taken relative to the Pierce murder conviction was August 1, 1988, the date upon which our supreme court issued its opinion on the petition for rehearing in the appeal affirming the Petitioner's conviction and life sentence for the Pierce murder. See State v. Smith, 755 S.W.2d 757, 768-69 (Tenn. 1988). The time for filing any post-conviction challenges to the Petitioner's Pierce murder conviction and sentence therefore expired on August 1, 1991. The supreme court made clear in Carter that the enactment of

the shorter limitations period in the 1995 Act did not revive claims that already were barred by the running of the prior three-year limitations period. See Carter, 952 S.W.2d at 420. As such, the Petitioner's post-conviction challenges to his conviction for the Pierce murder clearly were not timely filed.

The Petitioner concedes the untimeliness of these claims but takes the position that he had no meaningful opportunity to present them until his conviction and sentence for the Webb murder became final. In Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992), our supreme court held that, "under the circumstances of a particular case," it is possible that application of the statutory limitations period for filing a petition for post-conviction relief "may not afford a reasonable opportunity to have the claimed issue heard and decided." The supreme court applied this principle in Williams v. State, 44 S.W.3d 464 (Tenn. 2001), to circumstances in which there was some question as to whether the petitioner's court-appointed counsel, who represented him both at trial and on direct appeal, misled the petitioner into believing that the representation had continued beyond the date upon which it actually had ceased.

In Williams, the defendant's court-appointed trial and direct appellate attorney sent a letter, following this court's affirmance of the first degree murder conviction and life sentence in that case, informing the defendant of the decision and advising that counsel "'no longer had the authority to represent [the defendant] to a further court.'" Id. at 465. Approximately nine months after this court affirmed the Williams defendant's conviction and sentence, his counsel filed a motion to withdraw pursuant to Rule 14 of the Rules of the Supreme Court of Tennessee. See id. In his motion, counsel notified this court that the petitioner had never received the letter sent by counsel immediately after issuance of this court's opinion. See id. at 465-66. Counsel therefore requested in his motion to withdraw that this court grant the petitioner additional time within which to file his application for permission to appeal to the supreme court pursuant to Rule 11 of the Rules of Appellate Procedure. See id. at 466. This court denied counsel's motion to withdraw as untimely. See id. Counsel then filed an untimely application for permission to appeal to our supreme court, which was predictably denied and dismissed. See id.

Within one year of the supreme court's disposition of the untimely application for permission to appeal, the petitioner in Williams filed his petition for post-conviction relief. See id. The post-conviction court dismissed the petition, but this court reversed and remanded the dismissal for an evidentiary hearing to determine whether counsel's actions constituted grounds for a due process tolling of the running of the statute of limitations applicable to petitions for post-conviction relief. See id. at 467. Our supreme court granted the State's application for permission to appeal and affirmed this court's remand for further factual development on the due process tolling issue in that case. See id. at 467-72.

24

The supreme court in Williams described the issue presented as whether the petitioner had been "misled to believe that counsel was continuing the appeals process, thereby requiring the tolling of the limitations period" applicable to the petition for post-conviction relief. Id. at 471. The supreme court explained that "[t]he sole inquiry here . . . is whether [the] limitations period is tolled because of due process concerns surrounding possible attorney misrepresentation." Id. However, the supreme court emphasized,

> [W]e are not holding that a petitioner may be excused from filing an untimely post-conviction petition as a result of counsel's negligence. Instead, the focus here is only upon trial and appellate counsel's alleged misrepresentation in failing to properly withdraw from representation and in failing to notify the petitioner that no application for permission to appeal would be filed in this Court.

Id. at 468 n.7. In other words, Williams "appears to limit claims of attorney misrepresentation tolling the statute of limitations to times when counsel has made misrepresentations directly related to filing a defendant's appeal." Crawford v. State, 151 S.W.3d 179, 184 (Tenn. Crim. App. 2004).

In this case, the Petitioner makes no argument on appeal and presented no evidence during the extensive proceedings below establishing that he was misled regarding whether Weddington and Boatright continued to represent him in direct appellate proceedings related to the Pierce conviction after our supreme court affirmed that conviction in 1988. Because Williams was decided in 2001,[4] a full five years before the evidentiary hearing at which the post-conviction court heard testimony from Weddington and Boatright, we can surmise only one reason why post-conviction counsel failed to develop the necessary proof to achieve due process tolling of the limitations period relative to the Pierce murder post-conviction claims—such proof simply does not exist.

Thus, whereas a remand for such factual development was necessary in Williams in order to protect the petitioner's due process right to present his post-conviction claims "at a meaningful time and in a meaningful manner," Burford, 845 S.W.2d at 208, the Petitioner in this case had more than ample opportunity in the proceedings below to present the proof necessary to establish tolling and have his Pierce murder post-conviction claims heard on the merits. The failure to develop this necessary proof is fatal to all of the claims challenging the Pierce murder conviction and resulting life sentence. Cf. House v. State, 911 S.W.2d

---

[4]We accept that the amended petition, filed on May 10, 2001, may have been the Petitioner's first opportunity to assert his Williams-based tolling argument relative to the Pierce murder post-conviction claims because Williams was not decided until March 29, 2001.

705, 714 (Tenn. 1995) (holding that ineffective assistance on the part of post-conviction counsel does not preclude a finding of waiver). We decline to consider these claims as a challenge to the constitutionality of the Pierce conviction as one of the prior convictions used to obtain the Petitioner's death sentence for the Webb murder because, for the reasons discussed below, we vacate the Petitioner's death sentence.

### *Challenge to Webb Murder Conviction*

The Petitioner argues that the post-conviction court erred in denying his claims for relief from his 1989 conviction for the murder of Novella Webb. The Petitioner asserts that the prosecutor improperly made reference to deterrence in his guilt phase closing argument during the 1989 retrial, thereby violating the Petitioner's right to due process of law. The Petitioner also asserts that his defense attorneys provided ineffective assistance by: (1) failing to conduct any meaningful voir dire of the 1989 prospective jurors regarding any experiences they or someone close to them may have had as a crime victim, resulting in biased juror Morris Bagwell having sat on the Petitioner's 1989 jury; (2) failing to properly investigate and retain expert witnesses to support a defense of diminished capacity resulting from the Petitioner's brain-damage, post-traumatic stress disorder, and intoxication at the time of the crime; and (3) failing to adequately prepare and argue a motion to suppress challenging the Petitioner's arrest, detention and post-arrest interrogation.

Contrary to the conclusion reached by the post-conviction court, these claims were not barred by the running of the applicable limitations period. Under the Post-Conviction Procedure Act of 1995, "a person in custody under a sentence of a court of this state must petition for post-conviction relief . . . within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a) (1996).

In Joseph Shepherd v. State of Tennessee, Nos. E1999-01279-CCA-R3-PC & E1999-02266-CCA-R3-PC, slip op. (Tenn. Crim. App., Knoxville, Nov. 28, 2000), this court held that a petition for post-conviction relief challenging the petitioner's conviction for felony murder was timely when filed within one year of the date upon which his sentence for the conviction became final following the supreme court's affirmance of his conviction, reversal of his death sentence, and remand for resentencing. The petitioner in that case had been convicted by a jury of felony murder and sentenced to death. See id. at 1. On May 30, 1995, the supreme court affirmed the felony murder conviction, but reversed the death sentence and remanded for a new sentencing hearing. See id.; see also State v. Shepherd, 902 S.W.2d 895 (Tenn. 1995). The petitioner was resentenced to life imprisonment on April 29, 1997, took no appeal from the resentencing, and filed his petition for post-conviction relief challenging

his felony murder conviction on June 30, 1997.  See Shepherd, slip. op. at 1-2.  In determining that the petition was timely filed, this court reasoned:

> A petition for post-conviction relief must be brought "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final." Tenn.Code Ann. § 40-30-202(a). Noting that the supreme court had affirmed the petitioner's convictions but remanded for resentencing in 1995, the trial court dismissed the petitions, finding that the petitioner had failed to file within one year of the "final action of the highest State appellate court to which an appeal is taken." The petitioner's judgment of conviction for felony murder was not final at the point when the supreme court remanded the case for resentencing. See Tenn. R. Crim. P. 32(e) (stating that the judgment of conviction includes the sentence imposed).  The final order following the resentencing was entered on April 29, 1997, and the petitioner did not appeal the new sentence.  Thus, this case falls within the second half of the statute which permits filing within one year of the date the judgment becomes final when no appeal is taken.  See Baker v. State, 989 S.W.2d 739, 741 (Tenn. 1998) (holding that a post-conviction petition filed within one year of resentencing following the violation of a community corrections sentence was timely because "the resentencing hearing was the final action from which there was no appeal").  Thus, the petition filed on June 30, 1997, was timely.

Id. at 2.[5]

---

[5]We acknowledge that three years later, in Chesley Randell Thompson v. State of Tennessee, No. E2002-00580-CCA-R3-PC, slip op. at 2-3 (Tenn. Crim. App., Knoxville, Jun. 3, 2003), *perm. to appeal denied*, (Tenn. Oct. 6, 2003), without discussing the date upon which the petitioner in that case was resentenced, this court took the position that a petition for post-conviction relief challenging the petitioner's conviction for child rape was time-barred because it was not filed within one (1) year of either the supreme court's denial of the application for permission to appeal from this court's direct appeal opinion affirming the conviction but remanding for resentencing or the United States Supreme Court's denial of certiorari review following the supreme court's denial of review.  We believe Shepherd to be the better reasoned decision given the specific language of the statute of limitations in the Post-Conviction Procedure Act of 1995.  We also note that while the decision in James C. Leveye v. State of Tennessee, No. 01C01-9606-CC-00258, slip op. (Tenn. Crim. App., Nashville, July 23, 1997), *perm. to appeal denied*, (Tenn. Mar. 9, 1998), appears to reach the same result as Thompson, the Leveye case applied the statute of limitations as it existed prior to the 1995 amendments.  See Tenn. Code Ann. § 40-30-102 (1986).  Specifically, the pre-1995 statute of limitations did not include the language "or, if no appeal is taken, within one (1) year of the date on which the judgment became final." Compare Tenn. Code Ann. §40-30-102(a) (1996) with Tenn. Code Ann. § 40-30-102 (1986).

In this case, the Petitioner filed his petition for post-conviction relief on December 17, 1999, within one year of our supreme court's decision affirming his 1995 death sentence for the Webb murder. See State v. Smith, 993 S.W.2d 6 (Tenn.), cert. denied, 528 U.S.1023 (1999). As previously noted, the Post-Conviction Procedure Act of 1995 "contemplates the filing of only one (1) petition for post-conviction relief . . . attacking a single judgment." Tenn. Code Ann. § 40-30-102(c). Until the Petitioner was resentenced in 1995, he did not have a judgment to attack in post-conviction. See Tenn. R. Crim. P. 32(e) (stating that the judgment of conviction includes the sentence imposed). As a result, the time for filing a petition for post-conviction relief raising challenges to the Petitioner's conviction for the Webb murder did not begin to run until May 17, 1999, "the date of the final action of the highest state appellate court to which an appeal [was] taken" from the "single judgment" in the Petitioner's case. Tenn. Code Ann. § 40-30-102(a), (c). The position we take here is consistent with the approach this court has taken in the past in a capital post-conviction case with a procedural history similar to the Petitioner's. See generally Anthony Darrell Hines v. State of Tennessee, No. M2002-01352-CCA-R3-PD, slip op. (Tenn. Crim. App., Nashville, Jan. 23, 2004), *perm. to appeal granted* (Tenn. Jun. 28, 2004), *opinion on remand* Anthony Darrell Hines v. State of Tennessee, No. M2004-01610-CCA-RM-PD, slip op. (Tenn. Crim. App., Nashville, July 24, 2004), *perm. to appeal denied* (Tenn. Nov. 29, 2004) (addressing all claims challenging both the petitioner's felony murder conviction and death sentence where his petition for post-conviction relief was filed within one (1) year of the supreme court's opinion affirming the death sentence imposed on remand following the supreme court's prior opinion affirming only the conviction, reversing the first death sentence, and remanding for resentencing).

After erroneously determining that all of the Petitioner's challenges to the Webb murder conviction were time-barred, the post-conviction court alternatively found that the Petitioner had failed to prove his entitlement to relief on these claims by clear and convincing evidence. The State asserts in its brief that the record supports the finding of the post-conviction court in this regard. We agree.

*Prosecutorial Misconduct During 1989 Guilt Phase Closing Argument*

We need not address the Petitioner's argument that the prosecutor engaged in misconduct during his guilt phase closing argument during the 1989 trial because that claim has been waived. See Tenn. Code Ann. § 40-30-106(g). As post-conviction counsel concede in their brief, trial counsel did not object during the 1989 trial to that part of the guilt phase closing argument now challenged in post-conviction nor did counsel challenge that part of the argument on direct appeal from the 1989 conviction. The Post-Conviction Procedure Act states:

28

(g)     A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1)     The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2)     The failure to present the ground was the result of state action in violation of the federal or state constitution.

Id. The Petitioner's current challenge to the prosecutor's 1989 guilt phase closing argument is neither "based upon a constitutional right not recognized as existing at the time of [the 1989] trial," nor was the failure to present this claim in an earlier proceeding "the result of state action in violation of the federal or state constitution." Id. As such, the claim is waived for purposes of these post-conviction proceedings.[6]

*Failure to Meaningfully Voir Dire 1989 Jurors*

Juror Morris Bagwell was the only one of the 1989 jurors to testify at the post-conviction hearing. According to the testimony presented at the hearing by Weddington, Boatright, and juror Bagwell, as well as the transcript of the 1989 voir dire, the Petitioner's trial attorneys indeed failed to ask the 1989 prospective jurors whether they or someone close to them had ever been the victim of a crime. Both attorneys testified at the post-conviction hearing that such information was something a criminal defense attorney would want to know about a prospective juror and that they would have inquired further of any prospective juror they learned had been the victim of a crime or been close to someone who had been the victim of a crime. Both attorneys also testified that there was no tactical or strategic reason for failing to make these inquiries of the 1989 jurors. In fact, it appears from the record of the 1989 retrial that these attorneys intended to ask the 1989 prospective jurors questions that

---

[6]We note that, to the extent the Petitioner appears to be challenging the prosecutor's conduct during closing argument at either the 1985 trial or during the 1989 penalty phase, the Petitioner cannot demonstrate how such misconduct undermines confidence in his 1989 Webb murder conviction or 1995 death sentence. Both the conviction and death sentence imposed for the Webb murder by the 1985 jury and the death sentence imposed for the Webb murder by the 1989 jury were long ago reversed by the supreme court. See State v. Smith, 755 S.W.2d 757 (Tenn. 1988); State v. Smith, 857 S.W.2d 1, 25 (Tenn. 1993). Thus, any challenges to the Webb conviction or death sentence arising from the proceedings that already have been reversed cannot possibly provide a basis for relief from the Petitioner's 1989 conviction and 1995 death sentence for the Webb murder.

would have revealed whether they or anyone close to them had been the victim of a crime.

Prior to the 1989 retrial, the attorneys filed a pretrial motion for dissemination of a written juror questionnaire to the prospective jurors, and the proposed questionnaire attached to that motion included the following questions:

32. Have you ever been interested in a specific criminal case in this county? If so, what case and what was your interest? (Interest could be stimulated through the newspapers, TV, or other media.)

33. Have you ever been a victim of a crime? If YES, please explain.

The trial court granted the motion in part and indicated that the attorneys would be allowed to submit only the first eight (8) questions to the prospective jurors in writing. The questions quoted here were not among those allowed by the trial court to be submitted in writing to the prospective jurors.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an "impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Bias based on experiences "in certain classes of actions" or "against certain crimes," disqualifies a juror, "the theory being that a prejudicial bias has been implanted in the mind which will probably influence the judgment." Durham v. State, 188 S.W.2d 555, 558 (Tenn. 1945); see also Ricketts v. Carter, 918 S.W.2d 419, 422 (Tenn. 1996) ("'A question of potential bias arises when a prospective juror has been the victim of a similar crime.'") (quoting State v. Brooks, 868 P.2d 818, 823 (Utah App. 1994)).

"The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing 47 Am. Jur. 2d, Jury § 195 (1969)). As a result, one of "the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001); see also Hughes v. U.S., 258 F.3d 453, 457 (6th Cir. 2001) ("'At stake is [the] right guaranteed by the Sixth Amendment to an impartial jury; the principal way this right is implemented is through the system of challenges exercised during the voir dire of prospective jurors.'") (quoting U.S. v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976)).

While deference is generally given to counsel's actions during the conduct of voir dire, see Miller v. Webb, 385 F.3d 666, 672-73 (6th Cir. 2004) (citing Hughes, 258 F.3d at

457); see also Keith v. Mitchell, 455 F.3d 662, 676 (6th Cir. 2006); Butler v. State, 789 S.W.2d 898, 901 (Tenn. 1990), the Petitioner's defense attorneys both testified that they had no tactical or strategic reason for failing to ask the 1989 prospective jurors whether they or anyone close to them had ever been the victim of a crime. Absent a showing that counsel had a strategic reason for not asking the question, we conclude that the failure to ask the question in this capital case was objectively unreasonable and therefore constitutionally deficient. Cf. Hughes, 258 F.3d at 460 ("'Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel.'") (quoting Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992)).

However, this does not end our analysis. In order to prevail on this claim, the Petitioner was required to prove that counsel's deficiency resulted in a juror having sat on his jury who was biased as a result of having been a crime victim or having been close to a crime victim. See James A. Dellinger v. State, No. E2005-01485-CCA-R3-PD, slip op. at 31 (Tenn. Crim. App., Knoxville, Aug., 28, 2007) (affirming denial of post-conviction claim that counsel failed to sufficiently question prospective jurors to expose biases where petitioner presented no evidence in support of the claim that a biased juror was actually seated on the jury), aff'd, 279 S.W.3d 282 (Tenn. 2009); see also Keith, 455 F.3d at 676-77 (holding that claim based on "failure to conduct more comprehensive voir dire" requires proof that deficiency "substantially undermined the fairness of the trial"). Cf. Webb, 385 F.3d at 674 (holding that ineffective assistance of counsel claim based on failure to strike a biased juror required proof that challenged juror was biased against the defendant) (citing Hughes, 258 F.3d at 458).

Juror Bagwell testified at the post-conviction hearing that, had he been asked whether he or anyone close to him had ever been the victim of a crime, his answer would have been yes. Bagwell is a full-time minister. He is married and has two daughters. He explained that, as reported in a June 12, 1988 newspaper article in the Morristown Citizen Tribune, the boyfriend of one of his daughters was shot and killed by another man. According to Bagwell, and as reported in the newspaper article, the boyfriend, Charlie Minor, had been well-known and well-liked in the community prior to his death. Bagwell described Minor as having been a friend and good for his daughter. He testified that he had been pleased with his daughter's relationship with Minor and that her time with Minor had been "the best time in her life."

Bagwell explained that, consistent with what had been reported in the newspaper article, his daughter had been on the telephone with Minor immediately prior to the homicide. Bagwell also stated that he had gone with Minor's parents the first time they went to see their son after his death. When asked if he knew what happened to Minor's assailant, Bagwell stated, "He pled guilty and they gave him life in prison." At that point in the testimony, post-conviction counsel asked if Bagwell needed "to take a moment" to compose himself.

31

Bagwell responded that he was "okay." Post-conviction counsel then asked Bagwell whether Minor's assailant pled guilty to the murder around December 12, 1988, to which Bagwell responded: "December 12th? It seems like a long way. He did it immediately."

A copy of the newspaper article about Minor's death was admitted into evidence at the post-conviction hearing. The article summarized the facts surrounding Minor's homicide as follows:

> First degree murder charges have been filed against an 18-year-old man currently in a Kentucky hospital in connection with the Thursday night shooting death of Charlie Minor. . . .
>
> Investigators say [John Paul Seals] borrowed a 10-speed bicycle on Thursday afternoon, then contacted [another] young man. [Seals] put the bike in the back of a pick-up truck and asked the [other] youth to drive him to the scene so he could "go by Minor's house."
>
> [Hamblen County Sheriff Charles] Long said Seals told the boy to wait for him near Stuffle Road, north of Minor's residence, took the bike and left. The youth told the sheriff Seals wore a wig, beard and bandana as a disguise.
>
> The sheriff believes Seals rode the bike to Minor's house and rang the doorbell. Minor was talking to [Lakieta] Bagwell on the phone, told her someone was at the door and hung up.
>
> "He (Seals) then shot Mr. Minor one time at the door, point-blank range, then turned and ran to the bike," Long alleges. Minor ran after the defendant and was shot three more times, he said. The sheriff believes the shot that wounded Seals was fired in a struggle over the gun. "That's consistent with what witnesses saw," he added.
>
> Seals allegedly fled north, meeting with the other youth and abandoning the bicycle three-tenths of a miles from the scene of the shooting. The youth led officers to the beard, wig and bandana, found a mile from the scene.
>
> The sheriff said the youth drove Seals to a relative's home in Russellville and the relative took him to the Rogersville hospital.
>
> Seals, Seals' brother, William, who owns the truck, and Bagwell all worked together at Shenandoah Steak House, which closed recently.

Bagwell testified that the impact on his family as a result of Minor's death had been great. He stated that his daughter got married pretty quickly after the incident, which turned out not to be a good situation. He also confirmed that he counseled his daughter following Minor's death. Bagwell testified that he did not know whether any of his fellow jurors on the 1989 jury had known about his experience with Minor's murder.

On cross-examination by the State, Bagwell testified that he recalled telling Judge Calhoun, in response to questioning at the time, that there was no reason he could not give the Petitioner a fair trial. The State then asked Bagwell if, despite his daughter's boyfriend having been murdered, he had given the Petitioner a fair trial and based his verdict only upon the evidence presented during the trial. Post-conviction counsel objected to this question. The post-conviction court overruled the objection, and Bagwell testified that he had given the Petitioner a fair trial and based his verdict only on the evidence presented during trial. Post-conviction counsel again renewed the objection to this line of questioning, and the court again overruled the objection. On re-direct, Bagwell confirmed that he tends to be emotional and that he had "teared up" when discussing Minor's death during his direct examination testimony.

The State argues on appeal that, while juror Bagwell testified that Minor's death deeply affected both him and his family, he also testified that he gave the Petitioner a fair trial and based his verdict solely on the evidence presented. Citing to Hyatt v. State, 430 S.W.2d 129 (Tenn. 1967), and Walsh v. State, 166 S.W.3d 641 (Tenn. 2005), the Petitioner argues that Bagwell's testimony regarding what effect, if any, Minor's death may have had on his verdict cannot be considered in determining whether the proof supports the post-conviction court's denial of this claim. We agree. See Walsh, 166 S.W.3d at 649 ("[W]e conclude that it was error for the post-conviction court to consider the juror's testimony regarding the effect of the court officer's statement on her decision making process."); Hyatt, 430 S.W.2d at 129-30 (determining that presumption of bias arising from juror having failed to disclose during voir dire that he knew one of the defendants by another name as a result of his involvement in a prior prosecution of that defendant involving facts similar to those at issue in the trial could not be rebutted by juror's testimony that his verdict was not influenced by said facts); see also State v. Akins, 867 S.W.2d 350, 356 n. 16 (Tenn. Crim. App. 1993) ("Hyatt establishes that the juror's later testimony that the matter did not affect the juror is of little consequence."). Nevertheless, we conclude that, even if the proof presented at the post-conviction hearing established deficient performance on counsel's part relative to the questioning of the 1989 jurors, the Petitioner failed to demonstrate how he was prejudiced by counsel's deficiency, even without consideration of the improper testimony from juror Bagwell concerning whether Minor's death in any way affected the 1989 guilt verdict.

The Petitioner argues on appeal that the law presumes juror Bagwell to have been biased under the circumstances. "Whether a juror's partiality may be presumed from the circumstances is a question of law," and "courts have presumed bias in cases where the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial." Hunley v. Godinez, 975 F.2d 316, 318-19 (7th Cir. 1992); see also Durham v. State, 188 S.W.2d 555, 558 (Tenn. 1945) ("The general proposition is . . . that bias based on experiences in certain classes of actions, . . . or against certain crimes (homicide of a certain kind . . .), disqualifies a juror, the theory being that a prejudicial bias has been implanted in the mind which will probably influence the judgment."). However, in Tennessee, a presumption of juror bias arises only when the juror, in response to direct questioning during voir dire, willfully conceals or fails to disclose information which calls into question that juror's lack of impartiality. See State v. Hugueley, 185 S.W.3d 356, 378 (Tenn. 2006); Hyatt, 430 S.W.2d at 129-30; Toombs v. State, 270 S.W.2d 649, 651 (Tenn. 1954); Durham, 188 S.W.2d at 557-59; Akins, 867 S.W.2d at 355-56; State v. Furlough, 797 S.W.2d 631, 652-53 (Tenn. Crim. App. 1990); State v. Taylor, 669 S.W.2d 694, 698-700 (Tenn. Crim. App. 1983). The testimony presented at the post-conviction hearing established that juror Bagwell was never asked a direct question during voir dire which would have elicited from him the information presented at the hearing concerning his daughter's boyfriend's murder. As a result, the Petitioner failed to present evidence from which bias on the part of juror Bagwell could be presumed.

The Petitioner also argues that prejudice must be presumed from counsel's alleged deficiency in conducting the voir dire of the 1989 jurors because juror Bagwell, a presumptively biased juror, was seated on the 1989 jury as a result of counsel's deficiency. In support of this contention, the petitioner relies on Miller v. Webb, 385 F.3d 666, 674-76 (6th Cir. 2004), in which the Sixth Circuit held that Strickland prejudice is presumed where counsel's deficiency allowed a juror to remain on the panel even after she had admitted during voir dire that she was biased and could not be fair. However, this case is inapplicable to the circumstances presented here.

The Petitioner presented no proof at the post-conviction hearing that juror Bagwell was actually biased.[7] Instead, the Petitioner presented evidence from which he asks that bias

---

[7]We note that the typewritten unsworn statements that purport to be summaries of the interviews conducted of some of the 1989 jurors, copies of which were included in the appendix to the Petitioner's principal brief, cannot be considered evidence of actual bias for the same reason juror Bagwell's testimony regarding what effect, if any, Minor's death may have had on his verdict cannot be considered in determining whether he was actually biased—i.e. both concern the jury's deliberative process and not merely the existence of an extraneous or improper influence on the jury. See Walsh, 166 S.W.3d at 649. Even if these summaries could be considered, their evidentiary value appears tenuous at best in the form in which they were presented. The post-conviction court initially accepted the purported summaries into evidence only as

34

on the part of juror Bagwell be presumed. Applying a presumption of <u>Strickland</u> prejudice under these circumstances, even if we were to conclude that the Petitioner presented sufficient facts to the post-conviction court from which juror Bagwell's bias could be presumed, would be improper. <u>See</u> <u>Miller</u>, 385 F.3d at 678 (indicating that <u>Strickland</u> prejudice need not be presumed in the absence an affirmative statement of bias from the challenged juror); <u>see also</u> <u>Carratelli v. State</u>, 915 So. 2d 1256, 1260 (Fla. Dist. Ct. App. 2005) ("[T]o satisfy the prejudice prong of <u>Strickland</u>, a defendant must show that a juror who served on the jury 'was actually biased against him.'") (quoting <u>Miller</u>, 385 F.3d at 674). Accordingly, the post-conviction court properly concluded that the Petitioner was not entitled to relief on this claim.

*Failure to Investigate and Pursue Diminished Capacity Defense*

The Petitioner asserts that Weddington and Boatright also failed to properly investigate and retain appropriate expert witnesses to testify at the 1989 retrial regarding "the diminished capacity and intoxication of [the petitioner] at the time of the crime." The Petitioner asserts in his brief that "[d]efenses of intoxication and diminished capacity were available for presentation to the charge of first degree murder, and would have compelled a jury to return a verdict of second degree murder or manslaughter." The Petitioner also argues that appropriate investigation by Weddington and Boatright would have revealed that, "at the time of the offense, [the Petitioner] was brain-damaged, intoxicated, suffering from the effects of post-traumatic stress disorder, and incapable of forming the requisite intent to commit first degree felony murder."

Contrary to the position taken by the Petitioner in his brief, the evidence presented to the post-conviction court demonstrated that Weddington and Boatright exhaustively investigated the Petitioner's background and social history prior to the 1989 retrial and uncovered evidence supportive of his present claim that he "was brain-damaged, intoxicated, suffering from the effects of post-traumatic stress disorder, and incapable of forming the requisite intent to commit first degree felony murder." The fact that this evidence may not

---

offers of proof and then only as they might have some bearing on what Weddington and Boatright should have done with the information contained within the summaries. However, the only testimony presented at the hearing from Weddington and Boatright pertaining to these summaries was their testimony that their investigator, Ann Walker King, had interviewed some of the 1989 jurors after that proceeding. At no point during King's testimony at the post-conviction hearing did she confirm that the summaries introduced into evidence were prepared by her from the interviews she conducted with the 1989 jurors. Thus, even though these summaries purport to indicate on their face that some of the 1989 jurors were aware that someone close to Bagwell had been victimized by a homicide, and that it "seemed" to one of the jurors that "[t]he minister was ready to execute [the Petitioner] the first day of deliberation," we cannot consider these summaries as evidence.

have been presented at the 1989 retrial in the manner in which the Petitioner now argues it should have been cannot be considered deficient performance by counsel.

Both Weddington and Boatright testified at the post-conviction hearing that, prior to the Petitioner's first trial, he had been evaluated to determine his competence to stand trial and had been found to be competent. The records from the Petitioner's out-patient evaluation, conducted by the Bristol Mental Health Center on June 12, 1984, as well as his subsequent in-patient evaluations conducted by the Middle Tennessee Mental Health Institute (MTMHI) in June and November of 1984, were introduced into evidence at the hearing below.

According to these records, before the Petitioner's case was bound over for indictment, Sullivan County General Sessions Court Judge Gilbert E. Torbett granted Weddington's request to have the Petitioner evaluated to determine his competence to stand trial and sanity at the time of the offenses. The written report from the out-patient evaluation, conducted pursuant to this order, concluded that the Petitioner was competent to stand trial, but it referred the Petitioner for an in-patient evaluation at MTMHI due to the gravity of the charges against him as well as the Petitioner's "reluctance to participate in the forensic evaluation, a vague history of depression," the Petitioner's "belief that something is wrong with him," and the Petitioner's "drug and alcohol involvement."

Dr. Robert Glenn Watson, Ph.D., a retired clinical psychologist, who from 1979 until 1985 was the forensic psychologist certified by MTMHI to perform in-patient and out-patient evaluations on referral from the courts, testified that he had been a member of the team that conducted the in-patient evaluations of the Petitioner in 1984. According to Dr. Watson, the team had "a lot of trouble" in conducting the evaluation of the Petitioner because he refused to participate in any interviews or test-taking. Dr. Watson testified that the Petitioner finally agreed to participate in the evaluation, but he only agreed to "take tests if they were quick and fast."

Dr. Watson explained that, as part of the evaluation, a mental status examination was conducted in which the evaluation team looked for certain traits indicative of mental illness or defined mental conditions, including mental retardation. Dr. Watson described the results of the mental status examination as follows:

> Mr. Smith's speech and communication were rational and relevant and organized and logical and devoid of circumstantiality, tangentiality, looseness of associations, ideas of reference, paranoid ideation, rapid or pressured speech, flight of ideas, or other evidence of a thought disorder or affective illness. These are all symptoms of mental illness and so we found none of

36

those. His memory for recent and remote events appeared to be unimpaired, when you ask him questions about recent events and past events. His present judgment and insight was fair. He was very sad and was certain that the outcome of his trial was going to result in the death penalty. Unlike a lot of mentally disturbed people, he was clean and neat in appearance and evidenced no mental illness or defect supportive of an insanity defense.

Dr. Watson testified that team members observed the Petitioner cry at times during the evaluation period.

Dr. Watson testified that psychological tests were given to the Petitioner as part of the in-patient evaluation, including a Peabody Picture Vocabulary Test (PPVT) upon which the Petitioner achieved an IQ score of 86. Dr. Watson testified that the team chose to give the psychological tests that were given due to their brevity. Dr. Watson testified that, had the Petitioner been fully cooperative, the evaluation team would have given the longer Wechsler Adult Intelligence Scale-Revised (WAIS-R) test which is what they routinely used during such evaluations at the time. Dr. Watson testified that, based upon his observations of the Petitioner and review of the records he had at the time, he believed the results achieved on the PPVT test were a "reasonably accurate" measure of the Petitioner's intellectual capabilities. Dr. Watson conceded on cross-examination that the PPVT and the other tests given might not have been the best measures of the Petitioner's full scale IQ and possible brain damage; however, he emphasized that these were the only tests the Petitioner would cooperate in taking.

Based on the Petitioner's performance on the psychological tests, Dr. Watson testified that the evaluation team found no evidence of brain damage or functioning in the mentally retarded range. Dr. Watson testified that, if the evaluation team had found any indicia of mental retardation in their examination of the Petitioner, they would have had an expert in mental retardation from MTMHI conduct the mental status examination and that person would have filed a separate report with the court reflecting the results of his or her evaluation of the Petitioner. Dr. Watson also testified that the Petitioner's lack of cooperation with the evaluation and insistence on participating only in short form tests was inconsistent with the behavior of someone who is mentally retarded. However, Dr. Watson cautioned that the only areas the team was required to evaluate diagnostically were the Petitioner's competence to stand trial, his sanity at the time of the offense, and whether he met the criteria for judicial commitment to a secure facility. On cross-examination, Dr. Watson agreed that a mentally retarded person could be competent to stand trial, sane at the time of the offense, and not satisfy the criteria for judicial commitment.

The internal written report from the Petitioner's June 1984 in-patient evaluation at

37

MTMHI stated:

> Mr. Smith's competence to stand trial was assessed. He knew a jury was composed of 12 people who decide whether you are guilty or not. He knew witnesses testify for or against you and that an eye witness is someone who saw you commit a crime and that a character witness is someone who has known you for a while and will stand up for you in court. He knows to inform his lawyer immediately by whispering to him in the event a witness gives false or inaccurate testimony. He knows the defense attorney represents him and will try to get him out of his trouble while the district attorney represents the State and will try to prove him guilty of the crimes. He knows if found guilty the judge will pass sentence and that the judge makes decisions during trial and is like a referee who makes rulings during trial. He understands a plea bargain as pleading guilty in exchange for a lower sentence than expected if he went before a jury. He knows he is charged with two counts of first degree murder which means "premeditated murder" and that if convicted he could get a life sentence or the death sentence. He has a very pessimistic outlook on the outcome of his trial.

This report concluded:

> It appears that at the time of the alleged offenses Mr. Smith was exhibiting Antisocial Personality Disorder and might have been drinking as much as one and a half fifths of Jim Beam Whiskey and to have eaten two to four Elavil tablets. However, the findings fail to show that he was suffering from a mental disease or defect . . . resulting in substantial impairment of his capacity to appreciate the wrongfulness of the alleged offense, or to have resulted in substantial impairment of his capacity to conform his conduct to the requirements of the law. The psychological findings fail to support a defense of insanity. . . .

> It also appears from the psychological findings that Mr. Smith is quite mentally competent to stand trial in that he understands the nature and possible consequences of the alleged offenses, understands the judicial procedures and the functions of courtroom participants, can challenge witnesses through his attorney during trial and can consult meaningfully with his attorney in the preparation of his defense.

Dr. Watson summarized these same findings and conclusions in his testimony at the post-conviction hearing.

The written report of the June 1984 in-patient evaluation, prepared for General Sessions Judge Torbett and copied to Weddington, stated that the Petitioner was "capable of adequately defending himself in a court of law," that he "understand[s] the charge(s) pending against him and the consequences which might follow," and that "he is able to advise counsel and participate in his own defense." The report recommended that the Petitioner receive follow-up services from the Bristol Mental Health Center pending further action on his case.

According to the records introduced at the post-conviction hearing, on September 18, 1984, Weddington wrote a follow-up letter to the Director of the Forensic Services Division of MTMHI indicating that he had received the written report of the June 1984 in-patient evaluation and did not understand why the evaluation had been completed without consideration of certain additional information MTMHI had requested from him in a letter dated one day prior to the date of the written report provided to Judge Torbett. The response sent to Weddington indicated that early completion of the evaluation had been pursued because, on the same day the request for additional information had been sent to counsel, the Petitioner had made verbal threats of escape and had been found to be in possession of a lethal weapon (a "shank" fashioned from a strip of metal obtained from the air conditioner).

The records also show that Judge Calhoun subsequently signed an order directing that the Petitioner undergo a second in-patient evaluation at MTMHI to consider the information Weddington did not have the opportunity to provide prior to the completion of the June 1984 evaluation. In that order, MTMHI was directed to review and consider whatever pertinent information might be provided by Weddington in re-evaluating the Petitioner. The internal MTMHI report from the November 1984 in-patient evaluation, conducted pursuant to Judge Calhoun's order, stated in pertinent part as follows:

> The forensic team reviewed the additional information obtained and concluded that it confirmed [the Petitioner's] diagnosis of Antisocial Personality Disorder and Mixed Substance Abuse. These records fail to demonstrate even the possibility of a serious mental disease or defect supportive of an insanity defense but confirm the diagnoses and forensic decisions made at his first staffing.

> Mr. Smith's mental competence to stand trial was re-assessed during his second staffing on November 16, 1984. He appeared somewhat sad and meditative. He knew a jury of 12 would decide his guilt or innocence and if convicted of his charges of first degree murder he could be electrocuted or given a life sentence. He knew the district attorney would try to prove him guilty of the crimes while the defense attorney would try to prove him innocent. He understood that in a plea bargain agreement he would plead

39

guilty before a judge for a lesser sentence than expected from a jury trial. He had previously told the team that in the event a witness gave false or inaccurate information, he would immediately inform his attorney. He knew the judge passes sentences. He has previously demonstrated that he is quite capable of consulting with his attorney and providing factual information surrounding the alleged offenses for use in his defense. Once again it was determined he is mentally competent to stand trial.

However, a note contained within the Petitioner's written discharge summary from this in-patient evaluation stated:

[Mr. Smith] answered competency questions with clear understanding and accurate knowledge except for initial uncertainty on a couple of points—he denied that he knew how to respond to a lying witness but later said he didn't know before a previous staffing and I explained it then just as I did today. He showed very adequate ability to understand those issues explained. . . .

Dr. Daniel H. Grant, Ed.D., a board-certified neuropsychologist who testified as a defense expert at the post-conviction hearing, interpreted this note in the discharge summary to mean that the Petitioner was being told the answers to competency questions during the evaluation.

The written report of the November 1984 in-patient evaluation, prepared for Judge Calhoun and copied to Weddington, again stated that the Petitioner was "capable of adequately defending himself in a court of law," that he "understand[s] the charge pending against him and the consequences which might follow," and that "he is able to advise counsel and participate in his own defense." The report concluded that "Mr. Smith is competent to stand trial." The report also stated:

After careful review and consideration of records from Spencer Youth Center, Brushy Mountain Prison, DeBerry Correctional Institute, the Main Prison, and the Division of Juvenile Probation, in addition to social history information, psychological testing, and psychiatric interviews gleaned by the Forensic Services Division professional staff, it is the opinion of this staff that Mr. Smith was not suffering from a mental illness at the time of the alleged offenses which meets the criteria for an insanity defense. . . .

The Petitioner's records from his prior incarceration in the prison system were obtained by MTMHI directly from the Tennessee Department of Correction. Dr. Watson testified at the hearing that the evaluation team at MTMHI had been aware of the Petitioner's

40

history with the criminal justice system, including his time at the Spencer Youth Center and Brushy Mountain State Prison, as well as his long history of drug abuse; however, it is unclear from Dr. Watson's testimony whether the evaluation team was aware of this history at the time of the first in-patient evaluation or only at the time of the second in-patient evaluation. When asked on cross-examination whether he would agree that certain of the Petitioner's records indicated he had difficulty reading, Dr. Watson responded:

> I think he fakes. I think he malingers when it suits him and my opinion is that when he finds it to his advantage to play dumb, as you call it, he does so. Sometimes if you play dumb not a lot is expected of you. You can get away with a lot of things if you play dumb. And I think that's kind of part of him. . . . His cooperating or not cooperating. One time making a high IQ [score], then another examiner gives a test and it's low. . . . So, you can fake a low IQ, you can't fake a high IQ. I think that's an important point. You can't fake being a genius, if you make a high score you are. But if you malinger or don't try or answer the questions purposely wrong, you'll score low. And when you find a person who's got some high IQ scores and some low IQ scores you believe the high ones.

Boatright and Weddington testified that, in preparing for the 1989 retrial, they secured at state expense the services of Ann Walker King, a then part-time investigator for the Federal Public Defender's Office, on referral from the Capital Case Resource Center, to assist them in obtaining mitigating evidence for the penalty phase, and Dr. Pamela Auble, Ph.D., a clinical neuropsychologist. The attorneys testified that they supplied these defense experts with background material on the Petitioner that they felt might be relevant and necessary to their evaluation of the issues and the Petitioner.

Investigator King testified at the evidentiary hearing that, in her work on the Petitioner's case leading up to the 1989 retrial, she spoke at length with the Petitioner's mother, Orabelle Waggoner. King testified that she obtained information from Waggoner concerning the Petitioner's father's heavy drinking and predilection to violence during bouts of drinking, head injuries suffered by the Petitioner as a child, and the Petitioner's childhood hospitalization and near-death experience that had been caused by a rusty nail injury. Waggoner had also specifically told King that the Petitioner had huffed leaded gasoline to get high in his early teens and nearly died from one such experience. King's impression from her interview with Waggoner, and from talking to others, was that Waggoner suffered from developmental delay and was retarded.[8]

---

[8]King testified that she had obtained her bachelor's degree in psychology in 1971 and a master's degree in vocational rehabilitation counseling in 1973, both from the University of Tennessee. She further

Dr. Auble's written report of her evaluation of the Petitioner in March of 1989 was also introduced into evidence at the hearing.[9] This report contained the following summary of background information gathered and considered by Dr. Auble in her evaluation of the Petitioner:

Mr. Smith is the youngest of four children. . . . His mother never had prenatal care during any of her pregnancies.

. . .

When he was three years old, a nail was projected into Leonard's stomach by a lawnmower in operation nearby. He was admitted to the hospital on 9/2/64, but apparently they did not realize what was wrong immediately. On 9/3, his abdomen was distended, his pulse was rapid and his condition was serious. Surgery revealed that his stomach had been perforated in three places. On September 4, his temperature reached 107.2, his respiration was labored, and he had a seizure. His condition continued to be serious until 9/11/64, when he passed part of a rusty nail from his bladder. Leonard's mother reported that Leonard was "covered up" four times, and she was told he was dead. [Leonard's father,] Leroy shared Leonard's hospital room during this incident because he had a ruptured appendix. He also remembers Leonard being covered up for dead at least twice. He also said that Leonard had IV's in his arms and legs at the time. After the hospitalization, Leonard reportedly had recurrent nightmares during which he screamed and kicked, and wet the bed for at least several years.

A number of head injuries were reported, none resulting in hospitalization although several involved a loss of consciousness. At age 7,

testified that she had worked as a vocational rehabilitation counselor for the Tennessee Department of Education from 1973 until 1978. She testified that she had extensive experience working and interacting with adults with physical and mental handicaps, including mental illness and mental retardation, and had attended seminars on the subjects of developmental disabilities and mental retardation as part of her employment with the Federal Public Defender where she remains employed as an investigator.

[9]Different versions of Dr. Auble's report were introduced into evidence by post-conviction counsel and by the State. The ten-page, more detailed version of the report introduced by post-conviction counsel came from Dr. Schacht's files. The seven-page version of the report introduced by the State was apparently the version of the report provided to the State by Dr. Auble during her testimony at the 1989 retrial. The more detailed version of the report is quoted in the text. Dr. Auble did not testify at the post-conviction hearing.

Leonard said that he fell from a tree with a[n] unspecified period of unconsciousness. At age 9 or 13, he had a bicycle accident with a reported loss of consciousness of one hour. He said he was hospitalized after the bicycle accident for a foot injury. Once, the patient was operating a tire changer machine and was struck in the head by part of the equipment, sustaining a six minute loss of consciousness. The patient said that he was intoxicated at the time and refused hospitalization. He also reported occasional head injuries in prison fights.

Apparently, Mr. Smith had trouble in school from the very beginning. He said that he did adequately in some areas but poorly in others. Spelling was described as his weakest point. He thought that he repeated the third grade, although the school records indicated that he repeated the second grade twice and the third grade once. Apparently he was still in the third grade at the age of 11, and was then skipped to the fifth grade. His grades were usually C's and D's, although he did well during his third year in the second grade. His teacher in the fifth grade said that his attendance was sporadic. His scores on the California Reading Test from ages 6 through 12 showed very minimal improvement. When he was 6, he scored at the first grade level, and this only improved to the bottom of the fourth grade by the time he was 12. His conduct was rated as average in first grade, but declined to below average in third and fifth grade. In 1975, his principal reported that he was socially promoted from the fifth grade to the seventh grade, but had done no work in the seventh grade. He apparently was a behavior problem at middle school as well.

Two evaluations at the Spencer Youth Center revealed an IQ of 71 (borderline retarded). His initial achievement test scores in 1975 ranged from the second grade to the fourth grade. He did best on math and worst on social sciences. At discharge (apparently in 1976, no date on report), his achievement testing ranged from the fourth to the sixth grade. Again, he was best at math. His worst performance was on science and the social sciences. Reading was at about the fifth grade level. His school grades at Spencer Youth Center were usually B's. Mr. Smith said that he learned the most from school subjects in reform school because he was forced to participate. He was a permanent dropout in the ninth grade.

. . .

Mr. Smith said that he began drinking at 12 or 13, though not heavily. He would also sniff gasoline with his friend. . . . [The friend] said that they

43

would do this every day after school and all day during the summers. . . . The gasoline would cause hallucinations and make them feel like they were somewhere else or that they were something else (e.g., a lamppost). Leonard said that the effects would last about thirty minutes, and then they would do it again. Once, he passed out while sniffing gasoline and he was left with the jar near his nose. He said that he almost died from that experience. Severe substance abuse began when he was at reform school. He said that he has smoked marijuana at levels ranging from one cigarette every two days to a half ounce per day. Alcohol consumption has been at times up to two fifths per day. In addition, he has apparently abused amphetamines, seconal, valium, praludes, percodan, quaaludes, LSD, heroin and synthetic morphine. In the past, he has been addicted to heroin and synthetic morphine for which he said he was treated at DeBerry Correctional Institute. He has used cocaine occasionally.

. . .

He reported intermittent depression all of his life which he has self-medicated with various substances. He said that he tried to kill himself in 1982 by hanging but was stopped by prison guards. . . . He complained of memory problems and being unable to think well. There is the possibility that his cognition has worsened in recent years because of his extensive substance abuse. He said that he has trouble remembering day to day events and gets frustrated easily. There are spatial distortions where things appear larger than they are in reality. . . .

In her report, Dr. Auble also summarized the results of the Petitioner's 1984 competency evaluations and indicated that "[t]he resulting profile indicated an individual who was very defensive about psychological problems in a naive way." She also described the results of two separate 1985 evaluations of the Petitioner which had concluded that the Petitioner suffered "from recurrent major depression, and antisocial personality disorder and mixed substance abuse" as well as "situational depression" with "an adjustment disorder with depressed mood." Based on her evaluation of the Petitioner, Dr. Auble had concluded:

[T]he neuropsychological data indicated borderline retarded functioning overall with particular deficits in attention, mental flexibility and fine motor speed. These results indicating dysfunction are most likely attributable to brain damage from any of a number of factors. His high fever and seizure when he was three, the multiple head injuries which he has suffered, and his long history of drug and alcohol abuse have probably all contributed to brain

44

impairment. From the personality testing, there was evidence of mild depression which is probably not sufficient to cause the observed impairment in concentration. This is a constricted man whose responses to situations will be simplistic and not always adaptive. An unexpected stressor might result in an overreaction which is impulsive and poorly considered. This would be even more true if he were intoxicated at the time of the stressor. His personality structure is such that he will have inordinate difficulty resisting the temptations of alcohol and/or drug abuse.

In his testimony at the post-conviction hearing, Boatright recalled that he had been aware of the Petitioner's participation in the treatment program at DeBerry Correctional Institute in 1982, but he could recall no details about this aspect of the Petitioner's history other than the fact that investigator King had "looked into that." Weddington conceded that, even though the information about the Petitioner's drug and alcohol treatment was useful in the case for mitigation, it was information that could "cut both ways" in terms of being helpful or harmful to the jury's perception of the Petitioner.

Boatright testified that, after the trial court ruled in favor of the State on the motion to suppress challenging the Petitioner's written statement to Keith Carr (quoted above), the focus of the defense was on developing proof for the penalty phase as opposed to the guilt phase. According to Boatright, the Petitioner had agreed with this decision on trial strategy. That said, Boatright testified that part of the defense strategy in the Petitioner's case had been to show that the Petitioner had been intoxicated at the time of the Webb murder.

In Tennessee, it is now well-established that "evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense." State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996). In addition, this court has noted that evidence of diminished capacity can be relevant "in determining whether [a] defendant had the requisite culpable mental state for felony murder." State v. Stacy Dewayne Ramsey, No. 01C01-9412-CC-00408, slip op. at 35-36 (Tenn. Crim. App., Nashville, May 19, 1998), *perm. to appeal denied* (Tenn. Jan. 25, 1999).

To be relevant and admissible, such evidence must demonstrate "that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). As the supreme court in Hall emphasized,

[P]sychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the

45

showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

Id. at 690 (emphasis in original).

However, the law in Tennessee regarding the admissibility of expert testimony pertaining to an accused's diminished capacity to form the requisite *mens rea* for a charged offense was not clarified until this court issued its decision in State v. Phipps, 883 S.W.2d 138, 146-49 (Tenn. Crim. App. 1994), after the Petitioner's 1989 retrial. See Hall, 958 S.W.2d at 689-90 (recognizing that Phipps clarified the law on diminished capacity evidence in Tennessee). This court has held that an attorney cannot be considered constitutionally ineffective for making an informed strategic decision not to present diminished capacity evidence in a trial that occurred prior to the Phipps decision. See Michael J. Nunley v. State, No. M2005-02257-CCA-R3-PC, slip op. at 6-7 (Tenn. Crim. App., Nashville, Dec. 26, 2006); Robert Williams v. State, No. E1999-00323-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Jan. 6, 2000).

Thus, even if the information gathered by trial counsel prior to the 1989 retrial could now have been admissible and relevant to show that the Petitioner lacked the capacity to form the requisite mental state for first degree murder, which we do not determine in this opinion, counsel cannot be considered constitutionally deficient for failing to pursue this line of defense in a case tried before the law on the admissibility of diminished capacity evidence was settled in Tennessee. The post-conviction court therefore properly concluded that the Petitioner was not entitled to relief on his claim that trial counsel were ineffective in failing to investigate or pursue diminished capacity evidence during the guilt phase of the 1989 retrial.

*Failure to Adequately Prepare and Argue the Suppression Motion*

The Petitioner contends that Weddington and Boatright also failed to adequately prepare and argue their motion to suppress challenging his arrest, detention and post-arrest interrogation. Both attorneys testified that the motion to suppress the Petitioner's statement to Keith Carr had been extensively litigated and that the Petitioner had testified at the 1985 suppression hearing in support of the motion. In fact, Weddington testified that the Petitioner had the opportunity at the suppression hearing to talk about any mistreatment he had suffered prior to giving his statement to law enforcement. A copy of the Petitioner's written statement, witnessed by Keith Carr at 11:10 a.m. on May 23, 1984, was introduced into evidence during the post-conviction hearing.

46

During his testimony at the post-conviction hearing, Weddington identified two photographs he took of the Petitioner shortly after his arrest. The photographs were introduced into evidence at the evidentiary hearing and show marks on the Petitioner's back. Weddington testified that he took the photographs because the Petitioner had stated that law enforcement had put a shotgun to his back immediately after his arrest. Weddington described the marks shown in the photographs as being round in nature. He opined that the marks appeared to be consistent with having been made by a shotgun barrel. Weddington could not say why he did not, either at the initial suppression hearing or when the suppression issue re-emerged prior to the 1989 retrial, introduce the photographs into evidence or testify himself regarding the injuries he had observed on the Petitioner's back. The Petitioner argues that counsel were deficient in not introducing this "critical evidence in support of their motion to suppress."

The evidence presented to the post-conviction court in support of this claim established only that the Petitioner had marks on his back immediately after his arrest that, in the opinion of his defense attorney, appeared to be consistent with having been made by a shotgun barrel. We fail to see how this evidence would have made any difference if presented by counsel at the suppression hearing. See Smith, 755 S.W.2d at 762-63 (detailing evidence presented at the suppression hearing and determining that it was sufficient to support the trial court's determination that the Petitioner's statement had been voluntarily given and not coerced). The post-conviction court properly concluded that the Petitioner was not entitled to relief on his claim that counsel failed to adequately prepare and argue the suppression motion.

### *Challenges to the 1995 Death Sentence for the Webb Murder*

The Petitioner argues on appeal that the post-conviction court erred in denying his claims related to his 1995 death sentence for the murder of Novella Webb. Specifically, he claims that Weddington and Boatright breached the acceptable standards for capital representation relative to the 1995 resentencing by: (1) failing to consult with their mental health experts before acquiescing to the Petitioner's waiver of mitigation; (2) failing to investigate and present evidence in support of their motion to recuse Judge Brown; (3) failing to raise mental retardation as a bar to the Petitioner's eligibility for the death penalty; (4) failing to investigate and present available mitigating evidence; (5) failing to object to prosecutorial misconduct during the direct examination of Sheriff Keith Carr and during the State's closing argument to the 1995 resentencing jury; (6) failing to object to improper testimony from the victim's daughter that the Petitioner lacked remorse for his crime; (7) failing to object to the exclusion of prospective jurors from the panel who held general opposition to the death penalty and failing to conduct any meaningful voir dire of those prospective jurors in an effort to rehabilitate them as viable jurors; (8) failing to conduct any

meaningful voir dire of prospective jurors on the meaning of mitigating evidence and failing to exclude jurors from the panel who could not consider and give effect to mitigating evidence in the sentencing process; (9) presenting testimony on behalf of the Petitioner in the form of hostile witness Sheriff Keith Carr; (10) failing to object to both the reasonable doubt instruction and an instruction that misstated the role of the jury in capital sentencing by suggesting that the finding of a single aggravating circumstance made death the "appropriate" punishment; and (11) failing to object to the setting of an execution date upon imposition of the death sentence where the Petitioner's 1995 death sentence was ordered to run consecutive to his 1989 life sentence for the Pierce murder and the life sentence had not yet expired.

We address only the claims that Weddington and Boatright breached the acceptable standards for capital representation by failing to investigate and present evidence in support of their motion to recuse Judge Brown and by failing to raise mental retardation as a bar to the Petitioner's eligibility for the death penalty. We conclude that the Petitioner is entitled to sentencing relief based on the recusal claim. We address the retardation claim because its resolution is relevant to the scope of the resentencing proceedings that will ensue.

*Mental Retardation as Bar to Death Penalty*

The Petitioner argues on appeal that Weddington and Boatright provided ineffective assistance in failing to raise his mental retardation as a bar to his eligibility for the death penalty. The State argues that the Petitioner failed to prove either deficient performance or resulting prejudice with regard to this claim. With regard to resulting prejudice, the State asserts and we agree that the Petitioner failed to prove during the post-conviction hearings that he is mentally retarded.

Mental retardation makes a capital defendant constitutionally ineligible for the death penalty. See Atkins v. Virginia, 536 U.S. 304, 321 (2002); Van Tran v. State, 66 S.W.3d 790, 812 (Tenn. 2001). The criteria for evaluating whether a defendant is mentally retarded, and therefore ineligible for the death penalty, are set forth in Tennessee Code Annotated section 39-13-203(a). See Van Tran, 66 S.W.3d at 812; see also Howell v. State, 151 S.W.3d 450, 455 (Tenn. 2004).[10] The statute defines "mental retardation" as follows:

> (1)    Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

_____

[10] The decision in Atkins left to the states the task of developing the standards necessary for determining who is mentally retarded and therefore constitutionally ineligible for the death penalty. See Atkins, 536 U.S. at 317.

48

(2)     Deficits in adaptive behavior; and

(3)     The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). The criteria set forth in the statute for determining mental retardation came from the nationally accepted definition of mental retardation used by the medical community at the time the statute was adopted. See Van Tran, 66 S.W.3d at 793 n. 2; see also Atkins, 536 U.S. at 317 n. 22 (noting that Tennessee's statutory definition of mental retardation generally conforms to the clinical definitions of mental retardation used by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association).

The Petitioner had the burden of production and persuasion to prove, by a preponderance of the evidence, that he is mentally retarded. See Howell, 151 S.W.3d at 465; see also Tenn. Code Ann. § 39-13-203(c); State v. Smith, 893 S.W.2d 908, 916 (Tenn. 1994). As this court recently explained in Perry Cribbs v. State, No. W2006-01381-CCA-R3-PD, slip op. at 45 (Tenn. Crim. App., Jackson, July 1, 2009), perm. to appeal denied (Tenn. Dec. 21, 2009):

A preponderance of the evidence means evidence which is of greater weight, or is more convincing, than that evidence offered in opposition. . . . The satisfaction of this preponderance standard requires the finder of fact to evaluate the evidence, determine what evidence is reliable, and determine what evidence is probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.

In State v. Strode, 232 S.W.3d 1, 16 (Tenn. 2007), our supreme court held that "both the significantly subaverage general intellectual functioning (as evidenced by I.Q. scores of 70 or below) and deficits in adaptive behavior must be manifested by the age of eighteen." In this case, the post-conviction court determined, in the order entered on May 21, 2004, that the Petitioner had shown by a preponderance of the evidence that he had suffered from deficits in adaptive behavior manifesting before the age of eighteen (18). The State does not challenge this finding in this appeal. However, the post-conviction court concluded that the Petitioner had failed to meet his burden of proof relative to whether he had significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (IQ) score of seventy or below, manifesting before the age of eighteen, as required by the statute.

The evidence presented during the post-conviction hearing on the mental retardation

49

claim included extensive testimony from Dr. Grant and Elizabeth Ann Sanders, an expert in developmental disabilities, special education, and mental retardation. The proof established that the Petitioner's IQ had been tested throughout his life and that he had achieved a range of scores on the various tests administered to measure his IQ.

In February of 1975, when the Petitioner was fourteen (14) years old, he was administered the Wechsler Intelligence Scale for Children (WISC) by Graduate Assistant Richard A. McDermott at East Tennessee State University (ETSU). The results of the test were approved by the Acting Clinical Director of ETSU's Youth Education Center, Dr. James W. Yoder, Jr. This test was conducted pursuant to a referral from Larry Walsh, the Petitioner's former juvenile probation counselor. On this test, the Petitioner achieved a full scale IQ of 80, with a verbal IQ of 79 and a performance IQ of 85.

In March of 1975 and February of 1976, the Petitioner was given the Ammons Quick test during his commitment as a delinquent child to the Spencer Youth Center. The Petitioner was fourteen (14) years old and fifteen (15) years old, respectively, when these tests were administered. The February 1976 IQ score recorded in the records is 97; however, Dr. Grant testified that this IQ score did not correspond to the performance raw score of 68 that the records reflect the Petitioner achieved on this test. Dr. Grant explained that the Petitioner's raw score of 68 corresponds in the tables published for use with this test to an IQ score of 84. The March 1975 IQ score recorded in the records is 70. Even though Dr. Grant also expressed concern with the validity of the March 1975 IQ score, this IQ score corresponds in the tables published for use with this test with the performance raw score of 52 the Petitioner achieved on this test.

A November 1980 classification summary prepared upon the Petitioner's admission into the custody of the Tennessee Department of Corrections (TDOC) to serve his sentences on his October 13, 1980 Carter County convictions for simple robbery and third degree burglary, reflects an IQ of 88.

As previously noted, the Petitioner achieved an IQ score of 86 on the PPVT administered to him as part of the evaluation conducted by MTMHI to determine his competence to stand trial for the Pierce and Webb murders. Dr. Auble tested the Petitioner using the Wechsler Adult Intelligence Scale-Revised (WAIS-R) test in March of 1989 as part of her evaluation of the Petitioner. On the WAIS-R, the Petitioner achieved a full scale IQ of 75, with a verbal IQ of 71 and a performance IQ of 85.

Two additional tests were administered to the Petitioner during the context of the post-conviction proceedings. In September of 2001, when the Petitioner was forty (40) years old, Dr. Michael G. Tramontana, Ph.D., a clinical psychologist at the Department of Psychiatry

at Vanderbilt University, who had been retained by post-conviction counsel to evaluate the Petitioner, administered the Wechsler Adult Intelligence Scale, 3rd Ed. (WAIS-III). On this test, the Petitioner achieved a full scale IQ of 77, with a verbal IQ of 78 and a performance IQ of 80. In November of 2002, Dr. Grant again administered the WAIS-III. On this test, the Petitioner achieved a full scale IQ of 65, with a verbal IQ of 66 and a performance IQ of 65.

Both Sanders and Dr. Grant testified at length regarding why an accurate IQ score cannot be achieved unless a recently standardized, culturally appropriate intelligence test is given to the test subject by a person qualified to administer such a test. They also testified regarding the importance of administering a recently standardized or normed test or at least appropriately interpreting the results of an older test, due to what is known as the "Flynn effect," which posits that, because people acquire more information and knowledge over time, the accuracy of an IQ test diminishes in direct proportion to the amount of time that has passed between when the test was normed and when it is administered.[11] Finally, Dr. Grant testified that the results of an Ammons Quick Test is not an accurate reflection of the test subject's IQ.

Based upon this evidence, the post-conviction court concluded that the Petitioner had failed to meet his burden of proof relative to whether he had significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (IQ) of seventy or below, manifesting before the age of eighteen, as required by the statute. Specifically, the post-conviction court rejected the IQ scores achieved by the Petitioner during his adult years and, apparently referencing the performance IQ achieved by the Petitioner in 1975 when he was fourteen years of age, concluded that "testing performed before the age of eighteen reflects a functional I.Q. of 85".

Post-conviction counsel filed a motion questioning the court's factual finding that the evidence had included a functional IQ score of 85 for the Petitioner before the age of eighteen. Counsel asserted in the motion that the only full scale IQ score presented at the hearing from the Petitioner's life prior to age eighteen had been a score of eighty (80), which counsel argued the proof had shown was an invalid score due to the obsolescence of the test at the time it was administered and the unacceptable manner in which the test had been

_____

[11]See also Walton v. Johnson, 440 F.3d 160, 178 n. 22 (4th Cir. 2006) ("The premise of the 'Flynn effect' is that IQ scores increase over time and that IQ tests that are not renormed to take into account rising IQ levels will overstate a testtaker's IQ score."). The described phenomenon was named after James R. Flynn, the political scientist who first documented the systematic rise in IQ scores in 1984. See James R. Flynn, Tethering the Elephant, Capital Cases, IQ, and the Flynn Effect, 12 Psych. Pub. Policy and Law 170, 172 (2006). The 1984 article documenting the initial findings made by Flynn was introduced into evidence at the hearing below.

administered. However, counsel argued that, even accepting the validity of this score, the only legitimate interpretation to be given to it, after adjustment for the "Flynn Effect" and the standard rate of error in measurement for that test, was that the Petitioner's full scale IQ prior to age eighteen met the statutory criteria of being seventy (70) or below.

In response to this motion, the post-conviction court entered a second order, on April 21, 2005, clarifying its findings in support of the denial of the mental retardation claim. The court concluded that the Petitioner had simply failed to present sufficient proof of an IQ score below seventy (70) prior to age eighteen. In so doing, the court rejected post-conviction counsel's arguments "regarding adjustments for margin of error" as being "contrary to [the] case law of this state."

Given the evidence presented at the mental retardation hearing, we cannot conclude that the post-conviction court erred by determining that the Petitioner failed to show by a preponderance of the evidence that he is mentally retarded as defined by statute. As our supreme court explained in Van Tran, the IQ scores necessary to meet the first prong of the statutory test for retardation are those "obtained through the use of standardized intelligence tests." Van Tran, 66 S.W.3d at 795. However, "[t]he statute does not provide a clear directive regarding which particular test or testing method is to be used." Howell, 151 S.W.3d at 459. The only IQ scores from the Petitioner's childhood presented for the post-conviction court's consideration were the Petitioner's full scale IQ score of 80 on the Wechsler Intelligence Scale for Children (WISC), obtained when he was fourteen (14) years old, and the scores of 70 and 84 obtained on Ammons Quick Tests when the Petitioner was fourteen (14) and fifteen (15) years old, respectively.

As previously noted, Dr. Grant testified that the results of an Ammons Quick Test are not an accurate reflection of the test subject's IQ. We therefore cannot quarrel with the post-conviction court's apparent rejection of the Ammons Quick Test scores, particularly the 70 score, in concluding that the Petitioner had failed to show by a preponderance of the evidence that he was mentally retarded and therefore ineligible for the death penalty. See Kevin Green v. Gene M. Johnson, Director of the Va. Dep't of Corr., No. 2:05cv340, 2006 WL 3746138, * 41 (E.D. Va. Dec. 15, 2006) (magistrate judge's report and recommendation accepting "uncontroverted testimony" that the Ammons and Ammons Quick Test are not IQ tests and should not be considered when determining whether a capital defendant is mentally retarded and therefore ineligible for the death penalty), *approved in* Kevin Green v. Gene M. Johnson, Director of the Va. Dep't of Corr., No. 2:05cv340, 2007 WL 951686, * 12 n. 19 (E.D. Va. March 26, 2007) ("Based upon his evaluation of expert evidence and testimony, the Magistrate Judge properly excluded Petitioner's . . . Ammons and Ammons Quick Test."),

*aff'd*, <u>Green v. Johnson</u>, 515 F.3d 290 (4th Cir. 2008), *cert denied*, 128 S. Ct. 2999 (2008).[12]

In addition, contrary to the argument presented by the Petitioner on appeal, our supreme court determined in <u>Howell</u> that the legislature intended for seventy (70) to be a "bright-line" cutoff score for purposes of satisfying the first prong of the statutory test with no consideration given to medically accepted standard errors of measurement.  See <u>Howell</u>, 151 S.W.3d at 457-59 (rejecting argument that scores used to establish first prong of test should be adjusted using a five-point standard error of measurement).  Applying the supreme court's holding in <u>Howell</u>, this court has determined that the statute does not allow for the first prong of the test to be satisfied with scores that have been interpreted as being seventy (70) or below when considered in light of the "Flynn effect."  See <u>Michael Angelo Coleman v. State</u>, No. W2007-02767-CCA-R3-PD, slip op. at 23 (Tenn. Crim. App., Jackson, Jan. 13, 2010) (determining that neither the statute nor the supreme court's decision in <u>Howell</u> "permits the 'Flynn effect' to have an end result on the determination of the threshold ceiling IQ of 70"), *perm. to appeal granted* (Tenn. June 17, 2010); <u>Byron Lewis Black v. State</u>, No. M2004-01345-CCA-R3-PD, slip op. at 14 (Tenn. Crim. App., Nashville, Oct. 19, 2005) (rejecting argument that scores used to establish first prong of test should be interpreted in light of the "Flynn Effect").

Recognizing that the guidelines within the medical community for diagnosing mental retardation have been, and will continue to be, refined as our knowledge in this area advances, see <u>Howell</u>, 151 S.W.3d at 457; see also <u>Coleman</u>, No. W2007-02767-CCA-R3-PD, slip op. at 21 ("While support for the use of the 'Flynn effect' is not universal in the forensic context, the acceptance is widespread and federal courts have acknowledged the appropriateness of considering Flynn-adjusted scores.") (collecting cases), this court is not at liberty to question the supreme court's conclusion in <u>Howell</u> that the legislature intended for the statute to include a "bright-line" cutoff score that does not "take into account measurement errors in the testing process."  <u>Howell</u>, 151 S.W.3d at 458.  Nonetheless, we agree with the observation made in <u>Cribbs</u> that, "by refusing to consider ranges of error, it is our view that some mentally retarded defendants are likely to be executed in Tennessee." <u>Cribbs</u>, No. W2006-01381-CCA-R3-PD, slip op. At 47-48.

*Failure to Investigate and Present Evidence in Support of*
*Motion to Recuse 1995 Resentencing Judge*

---

[12]Given the assertions made by post-conviction counsel both in the motion to rehear the post-conviction court's initial order on the retardation claim and their principal brief in this appeal, it appears counsel accepts that the Ammons Quick Test score cannot be considered an accurate reflection of the Petitioner's IQ.

The Petitioner argues that the post-conviction court erred in denying his claim that Weddington and Boatright provided constitutionally ineffective assistance by failing to investigate and present available evidence in support of their motion to recuse Judge Lynn W. Brown, Jr., the 1995 resentencing judge. We agree that the Petitioner presented sufficient evidence to the post-conviction court in support of this claim to warrant sentencing relief.

In declining to grant the Petitioner relief in his extraordinary appeal from the denial of the motion to recuse, this court commented that the limited record indicated that Judge Brown "had no recollection of the defendant's prior conviction" and that Judge Brown had ruled that the State "would not be allowed to introduce any underlying facts of the crime" at the 1995 resentencing hearing. Smith, 906 S.W.2d at 11. This court also stated that "this record does not indicate bias" on the part of Judge Brown. Id. at 12. However, this court advised defense counsel, in the following passage, that the issue could be more fully litigated on direct appeal from any judgment against the Petitioner:

> If the record is adequately developed so as to establish that the nature of the trial judge's participation in the earlier prosecution deprived the defendant of a fair and impartial arbiter in this case, relief in the way of a new sentencing hearing may be available. This opinion does not foreclose that possibility.

Id. On direct appeal from the 1995 resentencing, the Petitioner's renewed claim that Judge Brown should have recused himself was rejected because "no further evidence of the nature of the trial judge's participation in the underlying charge" was presented. Smith, 993 S.W.2d at 28 (appendix).

At the post-conviction hearing, both the original file from the records of the District Attorney General for the First Judicial District, Carter County, in State of Tennessee v. Leonard E. Smith, Case No. 8454, and a stipulation were introduced into evidence detailing the information Judge Brown would have given had he been called to testify regarding his participation in cases involving the Petitioner prior to becoming the judge for the 1995 resentencing proceedings. This evidence established the following timeline of relevant events.

On August 17, 1984, the Petitioner was indicted in Carter County for simple robbery and driving under the influence (DUI) in State of Tennessee v. Leonard E. Smith, Case No. 8454. Lynn Brown, who was then an Assistant District Attorney General (ADA) in Carter County, was assigned to prosecute the Petitioner.

On January 30, 1985, prior to the trial in either case, then ADA Brown placed a telephone call to H. Greeley Wells, Jr., the Assistant District Attorney General in Sullivan

54

County who was prosecuting the Petitioner for the Pierce and Webb homicides. A handwritten note from then ADA Brown, found in the District Attorney's file for the Carter County case, states: "Called Greeley Wells, Sullivan DA office. He says the judge will not let them introduce any conviction from Carter in sentencing in Sullivan. No poss. offer of concurrent time in Sullivan Co."

On February 15, 1985, then ADA Brown placed another telephone call to then ADA Wells. Another handwritten note from Brown, found in the District Attorney's files for the Carter County case, states: "Called Wells. Requested copy of def's statements in Sullivan Co." Then ADA Wells drafted a letter to then ADA Brown, dated the same day as the telephone call and pursuant to Brown's request, which states: "Dear Lynn: Please find enclosed a handwritten and typed copy of Smith's statement relating to the two robbery-murders he is presently charged with in Sullivan County. Good luck, H. Greeley Wells, Jr. P.S. Let me know the results of your trial." The referenced handwritten and typed copies of the statement given by the Petitioner to Keith Carr accompanied this correspondence to then ADA Brown and appeared in the District Attorney's file for the Carter County case.

A Carter County jury convicted the Petitioner on February 21, 1985, of simple robbery and DUI.[13] Then ADA Brown filed a notice in the case indicating his intent to seek persistent offender sentencing for the Petitioner based upon the Petitioner's 1980 Carter County convictions for robbery and third degree burglary. An undated handwritten note from then ADA Brown written on the bottom of his copy of the February 15, 1985 letter from then ADA Wells states: "Called Greeley — Told Greeley of conviction. They try him on March 18." On March 11, 1985, then ADA Brown sent a letter to then ADA Wells which stated: "Dear Greeley: Enclosed you will find certified copies of the indictment against Leonard Smith for robbery and also a copy of the minute entry of conviction as you requested. Please let me know if you need any additional information. Best of luck with the trial."

On April 8, 1985, the Petitioner was sentenced in the Carter County case to fifteen years' imprisonment for the robbery, and eleven (11) months and twenty-nine (29) days for the DUI. At the sentencing hearing, then ADA Brown attempted to elicit testimony from the probation officer who prepared the pre-sentence report regarding the fact that the Petitioner, by then, had been convicted of two counts of first degree murder in Sullivan County for the Pierce and Webb murders, which offenses had been committed during the course of armed robberies. The trial court in the Carter County case sustained defense counsel's objection

---

[13]The handwritten notes created by then ADA Brown during the 1985 robbery and DUI trial were also admitted into evidence at the post-conviction hearing under seal. However, these notes are nothing more than routine trial notes detailing the testimony presented and Brown's thoughts on how to use or respond to the testimony in prosecuting the case.

to this testimony. The trial court in the Carter County case also denied then ADA Brown's request to have the sentences in the Carter County case run consecutively to the sentences imposed for the Sullivan County murders. In making his request for consecutive sentencing, then ADA Brown announced on the record to the Carter County trial court that his request was based on the fact that "there's not been a death penalty actually carried out in this State."

In 1987, this court affirmed the Petitioner's convictions for simple robbery and DUI in the Carter County case that had been prosecuted by then ADA Brown. See State v. Leonard E. Smith, No. 78 (Tenn. Crim. App., Knoxville, Oct. 1, 1987), *perm. to appeal denied* (Tenn. Feb. 1, 1988). On June 3, 1988, in response to the Petitioner's timely filed *pro se* petition for post-conviction relief challenging the Carter County convictions, then ADA Brown filed an answer on behalf of the State defending the convictions.

In 1989, the Petitioner was indicted in Carter County for introducing or attempting to introduce contraband onto the grounds of the Carter County Jail on January 22, 1989. Judge Brown, was assigned to preside over the case. Less than one year had passed since he had been actively defending as an ADA the robbery and DUI convictions he had secured against the Petitioner in 1985. The Petitioner moved to recuse Judge Brown from presiding over this contraband case. The motion was denied.

After the Petitioner was found guilty in the contraband case, Judge Brown sentenced the Petitioner as a persistent offender based, in part, upon the 1985 robbery and DUI convictions he had obtained as a prosecutor. Judge Brown gave the Petitioner the maximum permissible term of ten years' imprisonment as a persistent offender to be served consecutively to "all other cases including his two convictions for Murder I in Hamblen County (transferred from Sullivan County)." In his motion for new trial in the contraband case, the Petitioner asserted that Judge Brown had committed prejudicial error by failing to recuse himself from presiding over the case "after having served as a prosecutor of the Defendant in several prior criminal cases resulting in convictions while a member of the District Attorney General's office, some of said convictions [having been] considered by the Court as aggravating circumstances in the sentencing of [the] Defendant in the present case." The motion for new trial was denied. This court later reversed the Petitioner's contraband conviction and remanded for a new trial without ever reaching the issue of whether Judge Brown should have recused himself in the case. See State v. Leonard Smith, No. 50 (Tenn. Crim. App., Knoxville, Dec. 19, 1990).

The Petitioner argues on appeal that the failure of Weddington and Boatright to investigate and develop the grounds set forth above in support of their motion to recuse Judge Brown constituted deficient performance under Strickland. Clearly, as we concluded in the extraordinary appeal from Judge Brown's denial of the motion to recuse, see Smith,

906 S.W.2d at 12, a judge is not required to recuse himself simply because he served as a prosecutor on a prior conviction used to enhance the penalty for the conviction in the case in which recusal is sought. See State v. Warner, 649 S.W.2d 580, 581 (Tenn. 1983). Our supreme court has also held that a judge is not required to recuse himself simply because he has prior knowledge of the facts of the case. See State ex rel. Phillips v. Henderson, 423 S.W.2d 489, 492 (Tenn. 1968). Prior adverse rulings, even if erroneous, numerous, and continuous are also insufficient, without more, to justify recusal of a judge. Alley v. State, 882 S.W.2d 810, 821 (Tenn. Crim. App.1994); see also State v. Reid, 313 S.W.3d 792, 816 (Tenn. 2006). Thus, as the State asserts in its brief, much of the evidence presented at the post-conviction hearing relative to this issue does not establish under the law that Judge Brown should have recused himself as the Petitioner's 1995 resentencing judge.

However, the evidence presented to the post-conviction court, when considered as a whole, established that then ADA Brown and District Attorney General H. Greeley Wells, Jr., the prosecutor on the Sullivan County homicides, were communicating with one another prior to the Petitioner's initial trial in 1985 regarding the possibility of Brown securing a conviction in the then pending Carter County robbery case to be used as an aggravating circumstance during the penalty phase of the trial on the Sullivan County homicides. The evidence also demonstrated that Weddington and Boatright would have learned about Judge Brown's involvement in the 1985 prosecution for the homicides had they simply reviewed the file of the District Attorney General for the Petitioner's 1985 robbery conviction, which by the time counsel filed their motion to recuse Judge Brown, was a matter of public record.

In 1992, this court affirmed the dismissal of the petition for post-conviction relief challenging the Petitioner's 1985 robbery and DUI convictions originally prosecuted and defended in post-conviction by then ADA Brown. See Leonard E. Smith v. State, No. 03C01-9110-CR-336 (Tenn. Crim. App., Knoxville, Apr. 29, 1992). There is no indication in this record that the Petitioner ever pursued federal habeas corpus relief relative to these convictions following the conclusion of his state post-conviction proceedings. The Court of Appeals made clear in Swift v. Campbell, 159 S.W.3d 565, 575-76 (Tenn. Ct. App. 2004), *perm appeal denied* (Tenn. 2005), that the contents of a District Attorney General's files related to a particular prosecution are a matter of public record once all state and federal post-conviction remedies related to the case are concluded. Thus, the District Attorney's file for the Carter County robbery case, prosecuted by then ADA Brown, was a public record subject to inspection by trial counsel prior to the 1995 resentencing when they filed their motion to recuse.

Whether Weddington and Boatright reviewed this file prior to filing their motion to recuse is unclear from their post-conviction testimony on this issue. What is clear is that the failure to have done so would have been below the standard of reasonably competent counsel

in a capital case. See Rompilla v. Beard, 545 U.S. 374, 383 (2005) (holding that the failure of capital counsel, who did not represent the defendant on his prior felony charges, to examine the public files pertaining to the prior felony convictions intended to be used by the prosecution against the defendant at the capital sentencing hearing, was objectively unreasonable and therefore constituted deficient performance under Strickland).

The procedural history in this case reveals that, even if counsel reviewed the file of the District Attorney General for the Petitioner's 1985 robbery conviction, they failed to allege in support of their motion to recuse Judge Brown any of the facts set forth above regarding the 1985 communications between then ADA Brown and then ADA Wells. When this court affirmed the denial of the motion to recuse, we noted that "this record does not indicate bias" and that the record "contain[ed] no specific allegations of impartiality other than the fact that the trial judge was a prosecuting attorney in a trial which led to one of the defendant's prior convictions." Smith, 906 S.W.2d at 12. Nonetheless, counsel were invited to investigate and further develop the record concerning "the nature of the trial judge's participation in the earlier prosecution" in order to determine whether his participation in the prior case "deprived the defendant of a fair and impartial arbiter in this case." Id. It is clear from the direct appeal opinion affirming the Petitioner's 1995 death sentence that counsel failed to heed this court's invitation. See Smith, 993 S.W.2d at 28 (appendix). On these unique facts, we conclude that counsel's investigation into the facts necessary to support the motion to recuse Judge Brown, both before and after the extraordinary appeal affirming the denial of the motion, was objectively unreasonable and therefore constitutionally deficient.

The question then becomes whether the Petitioner proved that "there is a reasonable probability" that, but for counsel's deficiency, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also King, 989 S.W.2d at 330. As the United States Supreme Court has cautioned, the focus of this inquiry is on whether counsel's error was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369.

As a result, in order to demonstrate Strickland prejudice resulting from counsel's deficiency in failing to properly investigate the facts necessary to support the motion to recuse Judge Brown, the Petitioner was not required to prove "that the actual outcome of the proceedings would have been different but for counsel's error," but only "that the result of the proceeding has been rendered unreliable" and that "our confidence in the outcome of the proceeding has been undermined by counsel's deficiency." Thompson v. State, 990 So. 2d 482, 490 (Fla. 2008); see also State v. Leonard Andrew Barnhouse, No. 48798-1-I, 2003 WL 220615, * 6 (Wash. Ct. App., Division 1, Feb. 3, 2003) (noting that, for Strickland purposes,

58

actual prejudice is not required to prevail on an ineffective assistance claim based on the failure to raise a judicial disqualification issue; "'where a trial judge's decisions are tainted by even a mere suspicion of partiality, the effect on the public's confidence in our judicial system can be debilitating'") (quoting Sherman v. State, 905 P.2d 355, 378 (Wash. 1995) (en banc)). Simply stated, Strickland prejudice in these circumstances requires only that the Petitioner demonstrate "a reasonable probability that a motion to recuse would have been successful." Johnnie Brannon v. James R. McDonough, No. 4:05cv307-WS, 2007 WL 2572077, * 10 (N. D. Fla. Sept. 4, 2007); see also Gerald Dean Skelton v. Jean Hill, No. 05-588-JO, 2007 WL 2458787, * 5.[14]

Under the Strickland prejudice standard, we conclude that the Petitioner carried his burden of proof and demonstrated the requisite prejudice resulting from counsel's failure to properly investigate and present facts supportive of the motion to recuse Judge Brown. Had the information included within this record been presented in support of the motion to recuse, Judge Brown would have been required to recuse himself. "A trial judge should grant a motion to recuse if he or she has any doubt as to his or her ability to preside impartially in a criminal case, *or whenever he or she believes that his or her impartiality can reasonably be questioned*." State v. Thornton, 10 S.W.3d 229, 237 (Tenn. Crim. App. 1999) (emphasis supplied) (citing Lackey v. State, 578 S.W.2d 101, 104 (Tenn. Crim. App. 1978)); see also Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). In other words, recusal is required not only when the judge subjectively has doubt regarding his or her ability to preside impartially but also when the judge determines objectively that "'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" Bean v. Bailey, 280 S.W.3d 798, 805 (Tenn. 2009) (quoting Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564-65 (Tenn. 2001)); Alley, 882 S.W.2d at 820, *quoted in* Reid, 313 S.W.3d at 815; see also State v. Ray, 984 S.W.2d 239, 243 (Tenn. Crim. App. 1998). As the supreme court held in Bean, "[e]ven if a judge believes he can be fair and impartial, the judge should disqualify himself when 'the judge's impartiality might be reasonably questioned' because 'the appearance of bias is as injurious to the integrity of the judicial system as actual bias.'" Bean, 280 S.W.3d at 805 (quoting Davis, 38 S.W.3d at 564-65).

In this case, Judge Brown recognized at the hearing on the motion to recuse, held prior to the 1995 resentencing, that "a judge should not preside in a proceeding where his

---

[14]We recognize that other courts addressing the prejudice prong of such an ineffective assistance of counsel claim have required a showing that the actual outcome of the proceeding would have been different had a different judge presided over the case. See U.S. v. Ruzzano, 247 F.3d 688, 696-97 (7th Cir. 2001); see also Carabajal v. Lemaster, 52 Fed. Appx. 473, 475 (10th Cir. 2002). However, such an analysis is not consistent with the definition of prejudice set forth in Strickland and clarified in Lockhart.

impartiality might reasonably be questioned, including instances where he has personal bias or prejudice concerning a defendant, personal knowledge of disputed factual evidence regarding the proceedings, or where he has served as counsel in [a] matter of controversy." However, because he had no recollection of his prior involvement in the Petitioner's cases beyond the fact that he had prosecuted the Petitioner for robbery while an ADA in Carter County, Judge Brown determined that under the circumstances his impartiality could not be reasonably questioned. Even considering the matter under the heightened due process standard applicable in capital cases, Judge Brown concluded, based upon the facts presented, that the allegations supporting the motion to recuse were insufficient to require recusal.

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002), *quoted in* Bean, 280 S.W.3d at 803, and Reid, 213 S.W.3d at 815. This constitutional right "is intended 'to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor.'" Bean, 280 S.W.3d at 803 (quoting Austin, 87 S.W.3d at 470). "'[P]reservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial.'" Reid, 213 S.W.3d at 815 (quoting Kinard v. Kinard, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998)). Particularly in a capital case, "it is absolutely essential that a judge be and remain impartial prior to the commencement of sentencing proceedings when the positions of the respective parties will be presented and considered by the court." Thompson, 990 So. 2d at 491.

While the jury is the sentencer in a capital case in Tennessee, see Tenn. Code Ann. § 39-13-204(a), it is still the duty of the trial court judge to determine, in his or her capacity as "thirteenth juror" when ruling on a motion for new trial directed to the sentencing phase, whether a jury's death verdict was contrary to the weight of the evidence presented at sentencing. See Tenn. Code Ann. §39-13-204(k); State v. Robinson, 146 S.W.3d 469, 529 (Tenn. 2004) (appendix). In this case, Judge Brown also functioned as a fact-finder in accepting the Petitioner's waiver of mitigation at the 1995 resentencing. Although our supreme court upheld Judge Brown's handling of the waiver on direct review, see Smith, 993 S.W.2d at 14, it did so without the benefit of the information developed by post-conviction counsel and presented at the hearing below.

"[T]he appearance of fairness in the justice system is as important as actual fairness to our society." Steadman v. State, 806 S.W.2d 780, 784 (Tenn. Crim. App. 1990), *perm. to appeal denied* (Tenn. 1991). As our supreme court explained in In re: Cameron, 151 S.W. 64 (Tenn. 1912):

60

It is only when the people are satisfied that impartial judges decide their controversies that they entertain feelings of reverence for the judgments of the courts of the land. . . . But it is of immense importance, not only that justice shall be administered to men, but that they shall have no sound reason for supposing that it is not administered. It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity.

Id. at 76, *quoted in* Steadman, 806 S.W.2d at 784.

Accordingly, we conclude that the post-conviction court erred in denying the Petitioner's claim that counsel provided constitutionally ineffective assistance by failing to investigate and present available evidence in support of their motion to recuse Judge Brown. Therefore, the judgment of the post-conviction court must be reversed in this regard and the matter remanded for a new sentencing hearing before a different judge. As this court stated previously, the Petitioner's attorneys "performed capably" throughout his lengthy proceedings and, "despite some rather gruesome circumstances, achieved some measure of success" for the Petitioner. Smith, 906 S.W.2d at 11. They are to be commended for their perseverance. Having said that, the proven constitutional deficiency cannot be overlooked.

We recognize that this is now the third death sentence the Petitioner has received for murdering Novella Webb that has been reversed by the appellate courts of this state due to legal error. However, "the Code of Judicial Conduct requires that judges divorce themselves from their own feelings and render decisions based upon their perception of the law and 'unswayed by partisan interests, public clamor, or fear of criticism.'" State v. Bordis, 905 S.W.2d 214, 233 (Tenn. Crim. App. 1995) (quoting Rule 10, Canon 3, of the Rules of the Supreme Court). As such, "[o]ur duty to be 'faithful to the law,' and that alone, compels us to reverse" the Petitioner's death sentence for the murder of Novella Webb and remand for a new sentencing hearing before a different judge. Id.

**Conclusion**

Based upon our review of the record, we hold that the post-conviction court erred in denying the Petitioner's claim that his trial attorneys provided constitutionally ineffective

assistance in their investigation and presentation of available evidence in support of their motion to recuse Judge Brown. The Petitioner proved both that counsel were constitutionally deficient and that the claimed deficiency prejudiced the outcome of the 1995 resentencing proceeding. The Petitioner's death sentence for the murder of Novella Webb, which was the result of the 1995 resentencing proceeding, is therefore vacated and this case is remanded for a new sentencing hearing. Judge Brown is disqualified from presiding over any further proceedings in this case. The judgment of the post-conviction court is affirmed in all other respects.

_____

NORMA MCGEE OGLE, JUDGE